2023-2282

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

IN RE: PEN

APPLICATION SERIAL NO.: 16/104,878
FILED: AUGUST 18, 2018
FOR: TRUE NANOSCALE ONE AND TWO-DIMENSIONAL ORGANOMETALS CONTINUATION

---

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board
Appeal No. 2022-001764

---

OPENING BRIEF OF APPELLANT (CORRECTED)

---

The Pen
954 Palm Ave., #103
West Hollywood, CA 90069
Tel: (310) 360-0640

*Pro Se*

December 7, 2023

# CERTIFICATE OF INTEREST

Appellant The Pen, representing himself pro se certifies the following:

1. The full name of every party represented by me is:

The Pen (the full legal name of a natural person)

2. The name of the real party represented by me is:

The Pen

3. All parent corporations and any publicly held companies that own 10 percent of more of the stock of the parties represented by me are:

None

4. The names of all law firms and the partners and associates that have appeared for the party in the proceedings below or who are expected to appear for the party in this Court and who are not already listed on the docket for this case:

None

Dated: December 7, 2023

/s/ The Pen
The Pen
Appellant Pro Se

# TABLE OF CONTENTS


| | | Page |
|---|---|---|
| CERTIFICATE OF INTEREST | | i |
| TABLE OF AUTHORITIES | | iv |
| STATEMENT OF RELATED CASES | | vi |
| JURISDICTIONAL STATEMENT | | 1 |
| STATEMENT OF THE ISSUES | | 1 |
| STATEMENT OF THE CASE | | 2 |
| SUMMARY OF THE ARGUMENT | | 5 |
| STANDARD OF REVIEW | | 7 |
| ARGUMENT | | 8 |
| 1. | REQUEST FOR JUDICIAL NOTICE OF THE SCIENTIFIC DEFINITION OF POLYMER | 8 |
| II | THE *SUA SPONTE* CITATIONS OF THE PTAB ARE WHOLLY INAPPOSITE TO THE FACTS OF THIS CASE | 9 |
| III. | THE PTAB FOUND THAT A CONDUCTIVE POLYMER CAN BE PATENTED ONLY AS LONG AS IT IS NOT A "POLYMER" | 12 |
| IV. | THE *WANDS* FACTORS ALSO FAVOR APPELLANT | 13 |
| V. | OTHER CASES ON ENABLEMENT FAVOR APPELLANT | 20 |
| CONCLUSION | | 22 |

ADDENDUM

PTAB DECISION OF 6/7/23 IN 2022-001764

APPLICATION 16/104,878

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

CASES PAGES

*Amgen Inc. v. Sanofi*, 598 US 594, 143 S.Ct. 1243 (May 18, 2023) .... 5, 7, 9, 10, 12

*Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361 (Fed. Cir. 1997) ..... 12, 20, 21

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 231 USPQ 81 (Fed. Cir. 1986) .................................... 20

*In re Antor Media Corp*., 689 F.3d, 1282 (Fed. Cir. 2012) ........... 7

*In re Buchner,* 929 F.2d 660, 18 USPQ2d 1331 (Fed. Cir. 1991) ...... 20

*In re Morsa,*713 F.3d 104 (Fed. Cir. 2013) ...................... 7

*In re Nuvasive, Inc.*, 842 F.3d 1376 (Fed. Cir. 2016) ............... 7

*In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) ...................... 7, 12, 13, 14, 19

*In re Wright*, 999 F.2d 1557 (Fed. Cir. 1993) ..................... 7, 9, 10, 12

*Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 221 USPQ 481 (Fed. Cir. 1984) .................. 21

STATUTES AND REGULATIONS

28 U.S.C. § 1295(a)(4)(A) .................................. 1

35 U.S.C. § 112(a) ........................................ 1

35 U.S.C. § 329 ........................................... 1

OTHER MATERIALS

https://www.snexplores.org/article/explainer-what-are-polymers ...... 9

*Polymer Science Dictionary*, by M. Alger, second edition, Chapman and Hall, 1997, Library of Congress catalog card number 96-86111 ... 8

U.S. Patent Application No. 14/738,829 ......................... 2, 4, 8, 13

U.S. Patent Publication No. 20100305288 ( *He et. al.*) .............. 2, 4

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant The Pen pro se states that no appeal from the Patent Trial and Appeal Board proceedings at issue in this appeal was previously before this Court or any other appellate court. There are no cases known to appellant that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

This is an appeal of a final written decision by the Patent Trial and Appeal Board ("PTAB") of the United States Patent and Trademark Office, which affirmed a rejection of utility patent claims. This Court has jurisdiction over the appeal under 35 U.S.C. § 329 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1. Did the PTAB err by resting its decision on and following cases with facts wholly inapposite to the facts of this case related to 35 U.S.C. § 112(a)?
2. Did the PTAB err by trying to limit the scientific definition of the word "polymer" related to 35 U.S.C. § 112(a)?
3. Did the PTAB err by failing to critically examine whether any purported required experimentation is "undue" related to 35 U.S.C. § 112(a)?

# STATEMENT OF THE CASE

Appellant The Pen ("Pen") appealed the final rejection of the current patent application 16/104,878 (filed on August 8, 2018.) to the Patent Trial and Appeal Board ("PTAB") which issued an opinion on June 7, 2023. The PTAB ruled in Pen's favor on the first ground of rejection before them. Unfortunately, their opinion on the second ground of rejection was based on *sua sponte* citations and *sua sponte* arguments which could easily have been rebutted if they had been made prior to the issuance of the opinion itself. Pen by the appeal now to this Court simply seeks the gracious opportunity to make that compelling rebuttal now.

It is relevant to the proper consideration of these issues to consider also proceedings in the virtually identical parent application 14/738,829 ("the '829 application") filed on June 13, 2015, of which the current application is a continuation-in-part. [Appx041.]

In the parent '829 application, Examiner found that the claims at issue were allowable "in proviso" if only Pen were to clarify certain details in the specification. [Appx231-32.] Because this could only be done by filing a new continuation specification, Pen decided to appeal to the PTAB.

Regardless, Examiner found that Pen had overcome US 20100305288 ( *He et. al.*), the only competing reference, which disclosed a short repeating structure of

oligomeric[1] subunits, incorporating sulfur atoms, in certain positions. [Appx231-232.] It is important to note that the claims had already been amended, without objection, to clarify that Pen was seeking to patent a polymer with more than 8 repeating subunits. [Appx225-226, claims 1, 21 & 22.]

Tragically, in perhaps one of the most cruel procedural readings ever, that attempted appeal was dismissed because Pen accidently tendered the wrong forwarding fee. [Appx236.] Pen found to his horror that it was jurisdictional. A petition seeking relief was denied. [Appx238.] Pen was seemingly left with no real, viable option but to file the current application to continue to pursue claims of his invention. In an abundance of caution, Pen included additional options for the size of the polymer, including one ("at least 50 repeating units") consistent with the most authoritative scientific definition he could find. [Appx070, claim 24, and Appx221.]

In response to the current application, Examiner then demanded a new restriction of the claims, contending for example that the form of the invention incorporating nitrogen atoms (claim 1) and the form with some other atom in the same position (claim 22) were different inventions. [Appx083.] Pen was

[1] In scientific parlance, an oligomer is considered to be a relatively short structure of polymerized subunits. See Request For Judicial Notice Of The Scientific Definition of Polymer, infra.

procedurally forced to make the election to pursue only independent claim 1 (and its dependencies) in this regard. [Appx087.] This of course at the same time necessarily made the *He* prior art (US 20100305288) entirely irrelevant for allowance consideration purposes.

In the first office action as to the current application, examiner made some additional cosmetic objections about the claims regarding the “n” and “x” numbers, even while acknowledging he knew what was meant. [Appx094.] In any case, Pen dutifully amended the claims yet again to conform to examiner’s requirements.

In response, Examiner then issued a final rejection with additional objections to these same, essentially identical claims, reaching all the way back to those of the parent ‘829 application.[2] For the very first time examiner objected that the “R” groups in the figures were not defined. This despite the fact that the claims expressly state that the “R” could be “anything.” [Appx067, claim 1, for example.] For the first time examiner argued that the synthesis details in the specification were not adequate. [Appx144-145.] Pen then appealed to the PTAB as to the current application.

In its subsequent opinion, the PTAB cited *sua sponte* two new cases not

[2] It is theoretically possible that Pen could have petitioned the Commissioner of Patents to object to these much belated objections, but surely Pen is not precluded from arguing their lack of merit here.

argued in the briefing[3], one only very recently decided by the Supreme Court, *Amgen Inc. v. Sanofi*, and long after the briefing. [Appx007-8.] These cases stand for the proposition that where it cannot be known *a priori* whether particular variations of a compound will be functional at all, those variations cannot be claimed. This was an argument not made by examiner. With regards to the "n" number of repeating units in the invention, the PTAB complained that the number might be unlimited. [Appx008, last line.] Again, this was an argument not made by examiner. Pen then appealed to this Federal Circuit in the instant appeal.

[3] For his part, examiner cited no actual cases at all in his answer to the PTAB. [Appx179.] Examiner simply twice pasted in the text of his final rejection of 1/8/21. [Appx 141.]

## SUMMARY OF THE ARGUMENT

The decision below is based on a fundamental misreading of applicable precedent on the question of 35 U.S.C. § 112(a) enablement as it relates to the facts of this case. In the first instance the PTAB followed decisions that turned on whether variations in the final product of an invention could be predictably functional, wholly inapposite to the facts of this case where the functionality (conductivity) of all final products is a certainty by the basic science involved.

In the second instance, the opinion of the PTAB betrays a fundamental misunderstanding of the scientific definition of the word "polymer," contending that Pen cannot claim as enabled a molecule of potentially unlimited length, when that is precisely what a polymer is, as understood by those skilled in the art.

In the third instance, the PTAB accepted at face value examiner's endlessly redundant assertions that Pen's invention required "undue experimentation" without critically assessing according to clear precedent what the test is for whether any possible required experimentation would be "undue" or not; and further by allowing examiner to wholly misrepresent the facts of this case as to Pen's disclosure of starting material, reagents, catalysts, etc., provided both by identification in the specification itself and by the inclusion of literature references with further reaction condition details.

## STANDARD OF REVIEW

This Court reviews the PTAB's factual determinations for substantial evidence and its legal determinations de novo. *In re Nuvasive, Inc.*, 842 F.3d 1376, 1379 (Fed. Cir. 2016). Because the PTAB referenced an *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). analysis without actually doing one for the record, it is not clear if they made any factual findings. But if they just accepted examiner's categorical misstatement of the facts of the specification regarding starting material, reagents, catalysts, etc., despite Pen's clear protestations, this was clearly erroneous. [Appx195.]

Enablement under 35 U.S.C. § 112(a) is a question of law based on underlying factual findings. *In re Morsa,* 713 F.3d 104, 109 (Fed. Cir. 2013); *In re Antor Media Corp.*, 689 F.3d, 1282, 1287 (Fed. Cir. 2012). The PTAB made no apparent factual finding as to whether any possible "R" group variations were critical for the functionality of the final product, but in any case applied the incorrect legal standard for its own *sua sponte* citations of *Amgen Inc. v. Sanofi*, 598 US 594, 143 S.Ct. 1243, 1254 (May 18, 2023), and *In re Wright*, 999 F.2d 1557, 1561-62 (Fed. Cir. 1993).

# ARGUMENT

## 1. REQUEST FOR JUDICIAL NOTICE OF THE SCIENTIFIC DEFINITION OF POLYMER

For proper consideration of this case, we must agree on a scientific definition of the word "polymer," because both examiner and the PTAB in turn have issued rejections as to length. For the examiner, not long enough, for the PTAB, too long.

Pen respectfully requests that the Court take judicial notice of the following defining resources, based on Rule 201 of the Federal Rules of Evidence, or alternatively based on the inherent equitable authority of the federal courts of appeals.

Long ago, during consideration of the parent '829 application, Pen tendered the most authoritative scientific definition he could find. [Appx221.] The Polymer Science Dictionary distinguishes the words "oligomer" and "polymer" as follows:

> Definition of Oligomer: "A polymer with only a few repeat units in each polymer molecule, i.e. having a degree of polymerization up to a value of 10-20 units . . . In contrast, a polymer is often considered to contain at least 50 repeating units, and unlike an oligomer, removal of one or a few units makes no difference in its properties." *Polymer Science Dictionary*, by M. Alger, second edition, Chapman and Hall, 1997, Library of Congress catalog card number 96-86111, on page 350.

Let us kindly note that there are generally lower limits on length as

these terms are defined. But there is no upper limit. For once conditions are created for a polymerization reaction there is nothing to stop it until all starting material subunits (known as monomers) are consumed.

At the moment, a Google search for "scientific definition of polymer" returns https://www.snexplores.org/article/explainer-what-are-polymers at the top, which states the following: "Polymer chains can include hundreds of thousands of atoms — even millions." and "Polymers don't have a definite length." All we can know about these molecules is that they are large.

## II THE *SUA SPONTE* CITATIONS OF THE PTAB ARE WHOLLY INAPPOSITE TO THE FACTS OF THIS CASE

On the new question of the identification of the "R" groups, the PTAB elected to cite it's own cases, *Amgen Inc. v. Sanofi*, 598 US 394, 143 S.Ct. 1243, 1254 (May 18, 2023), and *In re Wright*, 999 F.2d 1557, 1561-62 (Fed. Cir. 1993).

Simply stated, these cases are wholly inapposite to the facts of this case, because whereas the structural variations in those cases implicate whether the final product will be functional at all, in this application the "R" groups cannot have any conceivable impact on the core functional objective.

which is electrical conductivity. Examiner never argued that the conductivity of the final product was a function of any "R" group.

In *Amgen,* there was a broad claim for a "vast" family of antibodies that Amgen had not themselves tested for functionality. *Amgen* at 1256. As to Amgen's proposed procedure the Supreme Court wrote:

> "These two approaches amount to little more than two research assignments. The first merely describes step-by-step Amgen's own trial-and-error method for finding functional antibodies—calling on scientists to create a wide range of candidate antibodies and then screen each to see which happen to bind to PCSK9 in the right place and block it from binding to LDL receptors. See Part I–B, supra; 987 F.3d, at 1088; 2019 WL 4058927, *10–*13. The second isn't much different. It requires scientists to make substitutions to the amino acid sequences of antibodies known to work and then test the resulting antibodies to see if they do too—an uncertain prospect given the state of the art. See Parts I–A, I–B, supra; 987 F.3d, at 1088; 2019 WL4058927, *10–*13" *Amgen* at 1256.

Exactly likewise with *In re Wright,* where the court found:

> "Both the Examiner and the Board correctly pointed out that Wright's appealed claims are directed to vaccines, and methods of making and using these vaccines, which must by definition trigger an immunoprotective response in the host vaccinated; mere antigenic response is not enough. Both also correctly pointed out that Wright attempts to claim in many of the appealed claims any and all live, non-pathogenic vaccines, and processes for making such vaccines, which elicit immunoprotective activity in any animal toward any RNA virus. In addition, both properly stressed that many of the appealed claims encompass vaccines against AIDS viruses and that, because of the high degree of genetic, antigenic variations in such viruses, no one has yet, years after his invention, developed a

generally successful AIDS virus vaccine." *In re Wright* at 1562.

So again, in that case, there was a claim for a vast category of all conceivable variations, without any evidence that any of them might actually work in the end.

In stark contrast, the functionality of Pen's invention has no conceivable dependence on any peripheral "R" group. As explained in the specification, in discussing the improvement over conventional polypyrrole represented by the invention:

> "Leaving aside the influence of metal atoms for just a moment, if one hoped to create a conducting solely organic polymer, single atoms bonds are too free to twist, making the pi-transfer of electrons through an otherwise **conjugated chain of alternating single and double bonds** imperfect. The point of ladder polymers is to lock the polymer chain in a ribbon-like plane for full conjugation. But anywhere in such a structure that a benzene moeity can be looked at in isolation this becomes an electronic sticking point that is happy being its own island of resonance. But by incorporating more nitrogen atoms in particular into ladder polymer structures, by the method of this invention we can achieve more facile pi-electron conjugation." (Emphasis supplied.) [Appx049, lines 7-16.]

There is no scientific way any "R" group attached to any of the nitrogen atoms in the structure could have any possible impact on such conductivity. By definition an "R" is its own terminus. Even if electrons were to theoretically seek to propagate up through an "R" group, they could pass no further. Rather, the conductive function of the **final product** is wholly dependent on the common core

feature of the structure of "conjugated chain of alternating single and double bonds," Accordingly, both the *Genetech* and *In re Wright* cases, where the final functionality was unpredictable, are wholly inapposite to the facts of this case.

The PTAB also cited *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361, 1362 (Fed. Cir. 1997), but apparently only for the purpose of bringing in some quoted language from *In re Wright*. If this Court is interested, we can discuss *Genentech* further in The *Wands* Factors section *infra*.

## III. THE PTAB FOUND THAT A CONDUCTIVE POLYMER CAN BE PATENTED ONLY AS LONG AS IT IS NOT A "POLYMER"

The PTAB made another *sua sponte* argument not made by examiner. They had a problem that there is "no upper limit to the number of repeating units" in Pen's invention. [Appx008, last line.]

Well . . . of course not . . . By scientific definition, of which Pen has respectfully asked this Court *supra* to take judicial notice, any polymer is of potentially unlimited length. As explained in the specification, "one skilled in the art should recognize that the chains will continue to extend until the starting material is consumed." [Appx055, lines 15-17.] That is, the PTAB's complaint is not against Pen, but instead against the science of polymerization itself.

What Pen attempted to do for the occasion of filing the current continuation-in-part was to give examiner every reasonable path to an allowance. Pen had already used the "more than 8" language all the way back in the parent '829 application, without objection to that amendment at that time by examiner, and was promised an "in proviso" allowance then. That language persists in the current claim 1. In current claim 10, the language "at least 50 repeating units" is incorporated. This is nothing more than consistency with the most authoritative definition of what a polymer is. Request for Judicial Notice of the Scientific Definition of Polymer, *supra*. It is essentially redundant.

Claim 1 included the descriptor "long chain" as to the polymer, again going all the way back to last amendment of the parent '829 application, again without objection from examiner. [Appx225.] This too is essentially just redundancy. The plain fact is that the word "polymer" standing alone has said it all from the very beginning. The only reason any of these amendments were made was in a valiant attempt to work with the examiner. For its part, the PTAB rejected on the basis that the conductive polymer might be too long . . . which is to say . . . a "polymer."

## IV. THE *WANDS* FACTORS ALSO FAVOR APPELLANT

The PTAB gave examiner credit for a "detailed discussion of the *Wands*

factors" though examiner did not actually cite the *Wands* case itself. [Appx006.] *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). But even if examiner had done so, he cannot just wave a *Wands* case and automatically prevail.

The PTAB neither enumerated the *Wands* factors themselves for the purpose of discussion, and most importantly, nor did they even acknowledge Pen's multiple citations of case law on the various points raised. [Appx 157-58; Appx195.][4] In any case, if this Court is inclined to hear further discussion on this Pen is prepared to accommodate this now. As summarized by MPEP 2164, the *Wands* factors are:

(A) The breadth of the claims;
(B) The nature of the invention;
(C) The state of the prior art;
(D) The level of one of ordinary skill;
(E) The level of predictability in the art;
(F) The amount of direction provided by the inventor;
(G) The existence of working examples; and
(H) The quantity of experimentation needed to make or use the invention based on the content of the disclosure.

Examiner argued on "breadth of claims" and "nature of the invention" that the fact that the "R" groups could be anything would require "undue experimentation." [Appx181.] So this is really a *Wands* H) argument, and

[4] The reason some of these arguments are in Pen's opening brief before the PTAB and not in his reply to examiner's answer is because there was really nothing new in the answer, just two pasted in copies of examiner's last final rejection.

arbitrary boilerplate at that. This led the PTAB on the wrong path to *sua sponte* make what their cases in fact identify as a final product functionality argument. But we might as well get a head start here on the experimentation to "make" the invention question.

Just as any possible "R" groups do not participate in the electrical conductivity function of the final product, neither do they enter into the chemistry of the synthesis of the product, which is based on two things only. [Appx156-157.] The first is the fact that it is a well known reaction that pyrroles polymerize under oxidizing conditions at the number 2 position[5], which is to say at one of the carbon atoms next to the nitrogen atom. So the first step in such polymerization is that two pyrrole monomers are linked like so (omitting for this most basic example any peripheral groups):




[5] This is familiar ground for one skilled in the art of organic synthesis, but for the edification of this Court, "oxidation" in this context means to remove hydrogen atoms and to form new bonds instead between carbon atoms and some other atom besides hydrogen in their place. Pen proactively asks the Court's forgiveness if any of this sounds like a chemistry lesson, but the basics must be understood.

In the figure above, by convention the nitrogen is numbered 1 in each starting 5-membered ring, with the atoms numbered 2-5 being the carbon atoms. This reaction is so facile that it is prone to take place under a large range of reagents and oxidizing reaction conditions. In the specification, Pen gave at least four of the most common known to those skilled in the art, complete with literature references including solvents, etc.

> "Then under acidic conditions this can be electrochemically oxidized [as for standard polypyrrole, *Synthetic Metals*, 2014, 191, 104] and/or chemically oxidized by $FeCl_3$ [*Chem Commun*, 2012, 48, 8246; *J Phys Chem B*, 2005, 109, 17474; US 5,855,819], or ammonium persulfate [*Journal of Physics: Conference Series*, 2009, 187, 012050], etc., to polymerize to the desired end product." [Appx 049.]

and

> It is already known that Ag+1 ions will oxidize and polymerize pyrrole. [*Synthetic Metals*, 2013, 166, 57] We can use silver in this way, or alternatively Cu+2 which is close to the silver ion in reduction potential, or even Cu+1, or Ag+2 from silver (II) oxide, which is thought to consist of one silver atom in the +1 oxidation state and one in the +3, and a strong oxidizer for this reason. [Appx 051.]

The sheer fact that this is a polymerization is another marker of how facile this reaction is under any of these conditions. After the first two monomers link up, the chain continues to grow in both directions indefinitely. Even assuming there were any "R" groups attached to the nitrogen atoms they simply don't

participate in this stage of the polymerization reaction[6]. They just don't matter. If anything they are an afterthought.

The second and concurrent step in the polymerization takes place in this invention, and this is Pen's key innovation, when there are amines in the 3 and 4 positions of the starting pyrrole. As explained to the PTAB:

> "At this point one skilled in the art would know one of the amines in the 3 or 4 position would be oxidized to a conjugated imine, a highly reactive functional group that could not help but participate in a substitution reaction with an adjacent and perfectly positioned amine substituent, especially under the catalyzing acidic conditions specified by applicant." [Appx156.]

These individual steps are well known chemistry, and not at all something anyone would have to exercise undue experimentation to achieve given the ample references of conditions and solvents provided.

At this point examiner's answer to the PTAB goes completely off the rails on the question of state of the prior art, arguing that "no prior art has shown enablement to produce the claimed polymer" exactly. [Appx181.]

Well . . . of course not . . . If so, Pen would not have much of an "invention" at all, now would he? Examiner's argument makes no logical sense whatsoever.

---

[6] Since the basic chemistry of nitrogen is to naturally form three bonds to other atoms, in this case at a minimum there would be one hydrogen as an R group, as in the primary given starting material, pyrrole,3,4-diamine. [Appx049.]

On the question of “level of ordinary skill,” examiner starts to blindly misrepresent the facts of this case, claiming that the specification is silent on “monomer, solvent, catalyst, etc.” [Appx144; Appx182.] What is the given pyrrole,3,4-diamine if not a starting material monomer? [Appx049.] What are electrochemical oxidation, $FeCl_3$, ammonium persulfate, Ag+1 ions, acidic catalyzing conditions in the range of 2-5 pH, if not reagents and catalysts, including all the relevant associated literature references giving the optimum solvents and other reaction parameters required? [Appx 049-051.]

On “predictability in the art,” no serious person skilled in the art would doubt that pyrrole,3,4-diamine would at least polymerize as far as would standard pyrrole. Neither is the concurrent amine substitution a stretch. Such amine substitution is a well known reaction standing alone. In particular, one skilled in the art would know that 5-membered ring formation is highly favored, which is what completes the ladder structure here And where, as here, you have atoms perfectly positioned to close such rings all the more so. And on top of that, this is especially so where there is extended conjugation of alternating single and double bonds, with a strong driving force towards such a structure as known by those skilled in the art. If none of this were true, Fukazawa could never have achieved even as much as they did. [Appx143.]

At this point, on the last 3 *Wands* factors, examiner just drops into broken record mode on "undue experimentation." But worse than that, kindly witness this closing argument from both the final rejection and examiner's answer to the PTAB:

> "The quantity of experimentation needed to achieve the claimed melt index via polycarbonate appears infinite, because no specific polymer has been indicated to be used. Therefore, the instant specification is insufficient, coupled with information known in the art, to inform one of ordinary skill in the art how to make and use the claimed invention without undue experimentation." [Appx145; Appx183.]

There is no "melt index" in Pen's specification . . . There is no "polycarbonate" to be found anywhere . . . Is there a polite and respectful way to call this out for the irrelevant nonsense it is? Most of this from examiner is just perfunctory boilerplate pasted in from some unknown and unrelated source, and has nothing to do with Pen's actual specification or invention.

The key holding from *Wands* is that any experimentation cannot be "undue."[7] *Wands* at 737. With all the guidance as to starting material, conditions, etc., demonstrated above, surely Pen's specification meets the bar here.

[7] Pen made this same point in his opening brief to the PTAB, citing *In re Angstadt*, 537 F.2d 498, 504, 190 USPQ 214, 219 (CCPA 1976). [Appx157.]

## V. OTHER CASES ON ENABLEMENT FAVOR APPELLANT

Let us quickly touch on other controlling cases on enablement, including those already cited to the PTAB by Pen. But first, as promised, let's return to *Genentech, Inc. v. Novo Nordisk*, since the PTAB also cited it, at least as a bridge to *In re Wright*.

*Genentech* lost their case because "the specification does not describe a specific material to be cleaved or any reaction conditions under which cleavable fusion expression would work." *Genentech* at 1365. The exact opposite is the case here, where the key starting material is not only specified, but a synthetic route to even that is provided, using all known reaction standard conditions. [Appx049-50.] Moreover, the literature references already cited and the specification itself give all the rest of the reaction conditions as already demonstrated.

Perhaps it is fitting that *Genentech* also cites at 1366 the case of *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* one of the very cases Pen cited to the PTAB in his opening brief there on the same point Pen was making. From MPEP 2164.01:

> "A patent need not teach, and preferably omits, what is well known in the art. *In re Buchner,* 929 F.2d 660, 661, 18 USPQ2d 1331, 1332 (Fed. Cir. 1991); *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802

> F.2d 1367, 1384, 231 USPQ 81, 94 (Fed. Cir. 1986), cert. denied, 480 U.S. 947 (1987); and *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1463, 221 USPQ 481, 489 (Fed. Cir. 1984)." [Appx157.]

*Genentech* goes on to reiterate that "when there is no disclosure of any specific starting material or of any of the conditions under which a process can be carried out, undue experimentation is required." *Genentech* at 1366. None of this can be fairly said about Pen's disclosure.

# CONCLUSION

In short, it seems the PTAB failed to even consider any of Pen's case citations and incorporated points of law, and instead tendered their own, which as it turns out are wholly inapposite on the facts.

Under these circumstances, Pen respectfully submits their decision mailed 6/7/2023 should be reversed as to the second ground for rejection.

Dated: December 7, 2023

/s/ The Pen
The Pen
Appellant Pro Se
954 Palm Ave., #103
West Hollywood, CA 90069
Tel: (310) 360-0640
dc@thepen.us

# ADDENDUM

# PTAB DECISION OF 6/7/23

# IN 2022-001764

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/104,878 | 08/18/2018 | The Pen | | 7609 |

7590 06/07/2023

The
Pen
954 Palm Ave., #103
West Hollywood, CA 90069

| EXAMINER | |
|---|---|
| FANG, SHANE | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1766 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/07/2023 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* THE PEN

---

Appeal 2022-001764
Application 16/104,878
Technology Center 1700

---

Before BEVERLY A. FRANKLIN, CHRISTOPHER C. KENNEDY, and JENNIFER R. GUPTA, *Administrative Patent Judges*.

KENNEDY, *Administrative Patent Judge*.

DECISION ON APPEAL

The Appellant[1] appeals under 35 U.S.C. § 134(a) the Examiner's decision rejecting claims 1, 4–6, 10, and 13. We have jurisdiction under 35 U.S.C. § 6(b).

We AFFIRM.

BACKGROUND

The subject matter on appeal relates to conductive polymers. *E.g.*, Spec. 8–9; Claim 1. Claim 1 is reproduced below from page 12 (Claims Appendix) of the Appeal Brief:

---

[1] "Appellant" refers to "applicant" as defined in 37 C.F.R. § 1.42. The Appellant identifies the real party in interest as the named inventor, The Pen. Appeal Br. 2.

1. A polycylic metallole heteroatom rich conductive long chain polymer comprised of the repeating unit in the brackets in either formula 2 below, where n is the number of repeating units, M is the heteroatom, R is any substituent, and x is the number of R substituents, depicted as




or formula 4 below, where n is the number of repeating units, M is the heteroatom, R is any substituent, and x is the number of R substituents, depicted as




where there are more than eight repeating units, and where the metallole heteroatom is nitrogen.

## REJECTIONS ON APPEAL

| No. | Claims Rejected | 35 U.S.C. § | Basis |
|---|---|---|---|
| 1 | 5 | 112(b) | Indefiniteness |
| 2 | 1, 4–6, 10, 13 | 112(a) | Enablement |

## ANALYSIS

As an initial matter, we observe that some of the issues that the Appellant raises relate to previous objections,[2] restriction requirements, and

[2] No objection is currently pending. *See generally* Final Act. dated Jan. 8, 2021.

alleged piecemeal examination. *See, e.g.*, Appeal Br. 4–7, 10–11; Reply Br. 3–5, 9–10. Issues of that nature are typically petitionable, not appealable, and the Board lacks the jurisdiction to address those issues. *See, e.g.*, MPEP § 1002.02(c); *see also In re Berger*, 279 F.3d 975, 984 (Fed. Cir. 2002); *In re Hengehold*, 440 F.2d 1395, 1403 (CCPA 1971).

Additionally, we observe that the Appellant sometimes uses the word "objection" when referring to aspects of the Examiner's rejection analysis. *E.g.*, Appeal Br. 7 ("EXAMINER'S NEW OBJECTIONS"); Reply Br. 6 (header III). In patent prosecution, "objection" and "rejection" are formal terms that refer to distinct issues that may be raised by an Examiner during examination. *See, e.g.*, MPEP § 706.01 ("The refusal to grant claims because the subject matter as claimed is considered unpatentable is called a 'rejection.' The term 'rejected' must be applied to such claims in the examiner's action. If the form of the claim (as distinguished from its substance) is improper, an 'objection' is made."). We note for the Appellant's benefit that it may be confusing to refer to an aspect of a rejection analysis as an "objection" given that formal objections can be made by an Examiner and, as noted above, objections are often addressed by petition rather than by appeal to the Board.[3]

---

[3] Relatedly, we note that in the Examiner's Answer, the Examiner states that "no objection" was made on the basis of the "R" groups, Ans. 6, and, in the Reply Brief, the Appellant expresses surprise over that statement, Reply Br. 8 ("Now we read that in the Examiner's Answer that he has no such contention . . . . yet two pages before, Examiner had just reiterated the specious R group complaint."). We understand the confusion here to be that the Appellant is using the term "objection" to refer to aspects of the Examiner's rejection analysis, whereas the Examiner is using the term "objection" consistent with the MPEP as referring to formal objections.

We now turn to the pending rejections.

*Rejection 1*

Claim 5 depends from claim 4, which depends from claim 1. Claim 4 recites, "[t]he polymer of claim 1 used to store electrical power." Claim 5 recites, "[t]he polymer of claim 4, where the polymer participates in a redox reaction as a component in the anode or the cathode of a battery."

The entirety of the Examiner's analysis is as follows:

> It is unclear what claim 5 attempts to claim based on the claim language: the polymer of claim 1 with further participation in a redox reaction or a redoxed polymer? For examination purpose, the limitation of "participates . . ." is treated as intend[ed] use limitations.

Ans. 3.

In the Appeal Brief, the Appellant states:

> Applicant confesses he does not understand what problem Examiner is trying to object to here. Examiner offers to interpret this as an intended use limitation. 16/104,878 Non-Final Rejection of 412120, p. 2. Applicant has no problem with that.

Appeal Br. 11.

In the Answer, the Examiner responds that "Applicant's agreement of the 112[b] rejection of claim 5 is duly not[ed]. Therefore, the [112(b) rejection has] been maintained." Ans. 9.

As best understood, the Examiner's concern with the disputed claim language is not that the claim language is ambiguous in and of itself, but that, because it simply recites an intended use, it may not further limit the subject matter of claim 1 or claim 4.[4] *See* Ans. 3. Thus, it appears that the

[4] For the Appellant's benefit, we note here that a claim to a composition is

Examiner determines that the claim is indefinite because it is unclear whether claim 5 is intended to encompass anything beyond what is already encompassed by claims 1 and/or 4. *See id.*

The Examiner has not established that claim 5 is indefinite. A claim is indefinite under 35 U.S.C. § 112(b) when it contains words or phrases whose meaning is unclear. *In re Packard*, 751 F.3d 1307, 1309 (Fed. Cir. 2014). The Examiner has not identified any particular lack of clarity in the words of claim 5. The Examiner's concern appears to be more relevant to 35 U.S.C. § 112(d), which requires a dependent claim to "specify a further limitation of the subject matter claimed" by the claim from which it depends.

Thus, we reverse the rejection under § 112(b). A rejection under § 112(d) is not currently pending.

*Rejection 2*

The Examiner determines that the full scope of the claims is not enabled because "R" can be "any substituent" and because the number of repeating units "n" is not limited despite the closest prior art teaching polymers with only 8 repeating units. Ans. 4–6. The Examiner provides a detailed discussion of the *Wands* factors. *Id.*; *see In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

---

typically limited by the composition itself; not by the intended use or function of the composition. *See, e.g.*, *Textron Innovations Inc. v. Am. Eurocopter Corp.*, 498 F. App'x 23, 28 (Fed. Cir. 2012) (functional language is limiting when it implies required structure) (citing *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999)); *cf. Hewlett Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("[A]pparatus claims cover what a device is, not what a device does.").

The Appellant argues that the Specification provides certain examples of what R may be, including Figure 1, where there is no R group ("the 'x' of the 'R' group is . . . exactly zero"). Appeal Br. 7. The Appellant also states that, "[i]f Examiner had even breathed a word of this at any time in the 3 years he was considering the previous application, applicant would at least have had a fair opportunity to insert additional demanded details in filing this new continuation-in-part." *Id.* at 8. As to the number of repeating units "n," the Appellant cites certain paragraphs[5] of the Specification as disclosing polymerization reactions. *Id.* at 8–9.

"[E]nablement requires that the specification teach those in the art to make and use the invention without undue experimentation." *Wands*, 858 F.2d at 737. "[T]o be enabling, the specification of a patent must teach those skilled in the art how to make and use *the full scope of the claimed invention* . . . ." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (alteration in original) (emphasis added). The Federal Circuit has explained:

> When rejecting a claim under the enablement requirement of section 112, the PTO bears an initial burden of setting forth a reasonable explanation as to why it believes that the scope of protection provided by that claim is not adequately enabled by the description of the invention provided in the specification of the application; this includes, of course, providing sufficient reasons for doubting any assertions in the specification as to the scope of enablement. If the PTO meets this burden, the burden then shifts to the applicant to provide suitable proofs indicating that the specification is indeed enabling.

*In re Wright*, 999 F.2d 1557, 1561–62 (Fed. Cir. 1993).

[5] The Appellant's citation to paragraph numbers is presumably to printed publication number 2019/0010289 A1, published Jan. 10, 2019.

The Supreme Court has also recently addressed the enablement requirement of § 112(a). The Supreme Court stated:

> If a patent claims an entire class of processes, machines, manufactures, or compositions of matter, the patent's specification must enable a person skilled in the art to make and use the entire class. In other words, the specification must enable the full scope of the invention as defined by its claims. The more one claims, the more one must enable.

*See Amgen Inc. v. Sanofi*, 598 U.S. ----, 143 S. Ct. 1243, 1254 (May 18, 2023).

On this record, the Appellant fails to identify reversible error in the rejection. The Examiner has set forth a reasonable explanation as to why the full scope of the claims is not enabled. *See* Ans. 4–6. The Appellant's assertion that a limited number of species for "R" is enabled fails to address or identify error in the Examiner's determination that the scope of the claims is broader than what is enabled. Similarly, even assuming that a certain number of repeating units "n" is enabled, it is unclear how the paragraphs cited by the Appellant show enablement of the full scope of the claims, which have no upper limit to the number of repeating units.[6]

---

[6] In the Reply Brief, the Appellant states that "it is categorically untrue that the specification is silent on the R groups." Reply Br. 7. The enablement issue before us concerns whether a person of ordinary skill in the art could practice the full scope of the claims without undue experimentation, not whether the Specification includes any disclosures related to the R groups. The Appellant may be conflating the "written description" requirement of § 112(a) with the separate and distinct "enablement" requirement of § 112(a). *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010) (en banc) (finding "two separate" requirements in 35 U.S.C. § 112, ¶ 1 (now § 112(a)).

Even if we were to agree with the Appellant that it would have been preferable for the Examiner to raise these concerns at an earlier point, we remind the Appellant that the Appellant may still choose to amend the claims to narrow their scope in a way that addresses the Examiner's concerns.

On this record, we are not persuaded of reversible error in the Examiner's rejection. *See In re Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011) ("[I]t has long been the Board's practice to require an applicant to identify the alleged error in the examiner's rejections . . . .").

CONCLUSION

In summary:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 5 | 112(b) | Indefiniteness | | 5 |
| 1, 4–6, 10, 13 | 112(a) | Enablement | 1, 4–6, 10, 13 | |
| **Overall Outcome** | | | 1, 4–6, 10, 13 | |

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a). *See* 37 C.F.R. § 1.136(a)(1)(iv).

AFFIRMED

# APPLICATION 16/104,878

# TRUE NANOSCALE ONE AND TWO-DIMENSIONAL ORGANOMETALS CONTINUATION

by The Pen

## COPYRIGHT NOTICE

A portion of the disclosure of this patent document contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure as it appears in the Patent and Trademark Office Patent file or records, but otherwise reserves all copyrights whatsoever.

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a Continuation-In-Part of and claims priority from U.S. patent application Ser. No. 14/738,829, TRUE NANOSCALE ONE AND TWO-DIMENSIONAL ORGANOMETALS, filed Jun. 13, 2015, and still pending (the "parent application"). Any disclosures in the parent application not repeated verbatim in this filing are expressly incorporated as if reproduced in their entirely herein.

## BACKGROUND

The rapidly growing field of nanomaterials holds out the promise of taking advantage of quantum electronic effects at the nanoscale by the creation of nanowires and thin nanosheets. However, as currently produced, nanowires in particular are still not sized down to the single atom sub-nanometer scale where such effects would be most pronounced. Being upwards of 10 nanometers in size, they should more properly be called nanorods, and what are called nanorods today are even larger.

In the conventional practice of organometallic chemistry, the organometallic reagents are generally thought of as a means for functional group change and/or chain building acting on other reagents, not intended as the primary component of the end product. Even where experiments have been done toward making polymers which include metallic atoms, the emphasis is generally on the non-metallic part of the polymerization process, and where if there are metal to metal bonds at all they are tenuous, discontinuous, strained, or unstable. [Polymer Degradation and Stability, 2011, 96, 1841]

With respect to the simple conduction of electricity there is simply not enough copper on the planet to provide for copper wiring for everyone, and the production of aluminum requires vast amounts of electrical power just to produce the metal itself. Realizing the full theoretical potential of conducting polymers holds out the promise of electrical conductors with reduced or even no actual metal content required.

Accordingly, there is a need to develop a new class of nanoscale polymeric materials, which we will call organometals, as distinguished from the usual usage of the word "organometallic," with the primary emphasis on metal to metal bonds, while at the same time achieving regular one-dimensional or two-dimensional structures, so that the products behave as metals, but with vastly increased edge boundaries and surface areas, to take full advantage of quantum effects supportive of applications like new super capacitors, battery materials, and very efficient conductors, even superconductors. For categorization purposes, all the new materials described herein are conducting polymers.

OBJECTIVES OF THIS INVENTION

This application teaches how to use steric, dipole and electronegativity effects to induce metal atoms to bond together in regular and stable, one and two-dimensional nanoscale structures. To achieve this as a practical matter, methods are taught whereby either one or two stable anti-metal substituents are coordinated, or covalently bonded, to metal or metalloid (hereinafter collectively

"metallic") atoms, by electrochemical means, chemical reduction of metal atoms, dehydrocoupling, dissolving metal reductions or chemical vapor deposition ("CVD"), and where the substituent functional group then guides the structure desired. In this context, "anti-metal substituent" means a functional group having a non-metallic atom other than carbon and hydrogen (the definition of an "anti-metal" atom) being the atom bonded to or coordinated with the metal atoms. This is all fundamentally different for example from the term "heteroatom" as commonly used in organic chemistry, which would also exclude carbon and hydrogen, but would include metals and metalloids.

The choice of a coordinating or a covalently bonded substituent for these purposes is determined by the method of this invention by the particular metal involved and its idiosyncratic properties. For the metals in groups 2 through 12, coordination structures are diverse, and compounds are ionic rather than covalent, with the exceptions being the family containing nitrides, carbides, etc., and where organometallic bonds to carbon are highly polarized and reactive. By contrast in group 13 trigonal covalent bonding is usually the order of the day, with carbon organometallic bonds again very reactive. And for the metals in group 14 tetrahedral covalent bonding is inherent.

For specific example, to create extended linear chains of metal bonded copper or silver atoms this application teaches how to construct in some embodiments new formulations of nitrogen atom rich coordinating polymeric backbones, which for all future purposes we will refer to as polycyclo-pyrrole (PCPy) and polycyclo-pyrazine (PCPz), designed so that the coordinating ligand nitrogen atoms are structurally spaced to correspond to the distance of metal-metal bonds, where metal atoms can then be deposited in those liganded positions, or for use standing alone. In the case of nitrogen in a PCPy type structure, there is also a useful reduced oxidation state, and this method can be extended to other metalloles incorporating other anti-metal atoms, In another embodiment, methods are taught for achieving discreet layers of a two-dimensional stanene product, which can be visualized as having the tin atoms arranged in an extended hexagonal cell pattern, extensible to other Group 14 metallic atoms, and favored in this structure by opposing

dipole interactions between adjacent metallic atoms created by attached anti-metal substituents. In other embodiments aluminum atoms are induced to bond in linear chains, strengthened by anti-metal substituents acting as electron donating groups, extensible to other Group 13 metallic atoms. And in yet a further embodiment copper or silver ions bound in a porphyrin derived structure are put into a close linear contact chain by linking the porphyrin units together edgewise perpendicular to their planes, with options for other metal atoms there as well.

As a broad overview, all the methods disclosed herein have a singular guiding theme, using anti-metal covalently bonded or guiding coordinate functional groups to encourage the metal atoms into the desired positions as they bond or connect together in the synthesis process.

BRIEF DESCRIPTION OF THE DRAWINGS

**Fig. 1** is a representation of the polymeric unit in polycyclo-pyrrole (PCPy).

**Fig. 2** is a representation of the polymeric unit in a polycyclo-metallole reduced by two electrons in relation to polycyclo-pyrrole. CLAIM ALL POSSIBLE METALLOLES

**Fig. 3** is a representation of the polymeric unit in polycyclo-pyrazine (PCPz).

**Fig. 4** is a representation of the polymeric unit in a generalized and fully oxidized polycyclo-metallole.

**Fig. 5** is a representation of a porphyrin modified according to the method of this invention in one embodiment with amine linking points in the 5 and 15 porphyrin numbering positions..

**Fig. 6** is a representation of metal complexed porphyrin subunits stacked togther with short edge linkers perpendicular to their faces.

Applicant uses in **Figs. 1-4,** and **Fig. 6**, an original "squiggle" notation intended to suggest yet further extension of the same polymeric structure inside of the bonds cut by the squiggles. This would necessarily have been obvious to one skilled in art, based solely on the synthesis conditions given in each example below. That is, there is no reason to expect that the structures would not continue to extend until the starting material in each reaction was consumed. Moreover, to the extent that the invention is claimed to be "comprised" of the repeating polymeric unit within the brackets in the respective figures, anything outside of the brackets is of no meaningful consequence to the operation of the invention. That is, any so-called "end groups" at the termination of polymeric polycyclic chains could be anything, though again one skilled in the art would know that the synthesis conditions greatly restrict what those end groups might possibly be, either what was in those positions in the starting material or a partial connection to another chain not critical to the core of the invention..

PRIOR ART

There are only sparse prior examples of direct metal to metal bonds in polymers with the exception of the Group 14 atoms, and there mostly attempts to synthesize linear polystannanes and polysilanes which we will address separately in a moment. Otherwise all one mostly finds are examples of isolated pairs of metal atoms bonded together and incorporated somewhere into a chain [Alaa S. Abd-El-Aziz, Ian Manners, *Frontiers in Transition Metal-Containing Polymers*, A John Wiley & Sons, Inc., 2007, p. 288, Equation 7.1], metal atoms alternating with other bonding atoms along a chain [J. Organomet. Chem., 2014, 751, 67], or larger clusters of metal atoms embedded in an overall polymerized material [Acc. Chem Res., 2014, 47 (2), 579, Fig. 5; J. Appl. Phys., 2011, 109, 104301, Fig. 1, Macromolecular Research, 2012, 20 (10), 1096, Scheme 1]. None of these last examples enable the kind of continuous metal atom to metal atom contact on a true nanoscale which is the objective sought by this invention.

With regards to known syntheses of the polystannanes already mentioned, these have been limited to examples of alkyl or aryl groups [Adv. Mater., 2008, 20, 2225; Appl. Organometal.

Chem., 2011, 25, 769; J. Organomet. Chem., 2011, 696, 3041; Macromolecules, 2007, 40, 7878, Table 1], and on occasion hydrogen [Canadian Journal of Chemistry, 02/2011, 65(8), 1804, Equation 1], as additional substituents bonded to each tin atom, with such compounds proven to be sensitive to light decomposition and moisture.

US Patent 5,488,091 ("Tilley") claimed polystannanes with substituents that might include alkoxy and other anti-metal substituents as defined here. However, there is no evidence that Tilley ever attempted to synthesize any such compound, in practical application focusing entirely on "dialkyl-, diaryl-, and mixed alkyl-, aryl-hydrostannanes." Tilley, col. 3, lines 52-54. In particular, Tilley did not disclose the geometry of a two-dimensional product consisting of polycyclic hexagonal rings, what would theoretically be called a decorated (that is mono-substituted) stanene, specifying only that a mono-substituted hydrostannane starting material could result in "branched" products. Col 3, lines 54-57. Moreover, Tilley's method, employing bulky transition metal complexes for his dehydrocoupling reactions, unlike the sterically compact dehydrocoupling catalysts taught herein in one embodiment, could not achieve a stanene structure if that was the objective, instead favoring linear chains in all cases. Col 8, lines 38-42.

There was a purely theoretical study published in 2013 showing representations of decorated stanene with one non-tin substituent per tin atom, which might have included halogens or an alcohol. [Phys. Rev. Lett., 2013, 111, 136804, Fig. 1]. The authors of the paper proposed no actual synthesis route except a generic reference to molecular beam epitaxy (and various exfoliation techniques presuming the pre-existence of the material in bulk), where any substituents would be provided from a separate component apparently participating in some kind of in situ chemical reaction during a polymerization process, which would not provide meaningful control over the exact number of substituents added per individual metallic atom. Another purely theoretical paper from 2015 depicted hydrogen decoration. [Small, 2015, 11 (6) 640] And just recently there has been a paper submitted claiming the achievement of a stanene containing tin alone, or oxidized after the fact by hydrogen peroxide, by a method of "ultra-fast light matter interaction in liquid ambience followed by hydrazine treatment," with no other

suggestion of any inherent and integral substituents. [http://arxiv.org/abs/1505.05062, submitted for publication]. In short, if any method had been heretofore disclosed, by Tilley or anyone else, for achieving as a practical matter a decorated stanene, the most recent theoretical reviews surely would have taken note of it.

Linear polysilanes substituted with chlorine or hydrogen atoms have been obtained [*Advances in Polymer Science, Silicon Polymers,* Muzafarov, A.M (ed.), Vol. 235, 2011, "Modern Synthetic and Application Aspects of Polysilanes: An Underestimated Class of Materials?," A. Feigl, A. Bockholt, J. Weis, and B. Rieger, p. 3, Fig. 3], and there are alkyl and aryl polysilanes [J. Organomet Chem, 2000, 611, 26, Scheme 1; *Advances In Organometallic Chemistry,* 2004 Elsevier Inc., Joyce Y. Corey, "Dehydrocoupling of Hydrosilanes to Polysilanes and Silicon Oligomers: A 30 Year Overview," Volume 51, p 1, Table II, p. 19] There is an instance of a claimed polygermyne with hydrogen substituents (sometimes referred to as germanane), obtained by decomposing a zintl compound. [Adv. Mater. 2000, 12 (17), 1278; Acc. Chem. Res. 2015, 48, 144-151], and various network polymers [Electrochemistry 2003, 71, 257; Macromolecules, 1993, 26, 869; Applied Physics Letters, 1994, 65, 1358]. But previous attempts were handicapped from their outset from achieving the kind of results demonstrated here because they did not apply the key electron donating, steric and dipole teachings of this application, which if respected enable this entire class. And metal to metal polymerization of Group 13 metallics has never before been attempted where there are anti-metal atom bonds involved, though there is one isolated example of purported "polymers" [US 3508886]. with too many substituents to enable the full metal to metal atomic interactions taught herein.

In short, there appear to be no meaningful examples in the literature of attempts to polymerize Group 14 metallic atoms, which would be exclusive of carbon, with a single anti-metal substituent bonded to each metallic atom by a non-metallic atom from Groups 15, 16 or 17. And in the case of two anti-metal substituents, nothing from either Groups 15 or 16, and for Group 17, only chlorine substituents in the case of polysilane. For the Group 13 metal atoms, again with no such substituents connected by atoms from either Groups 15, 16 or 17. This application seeks to

fill in these inventive gaps with enabling teachings.

There have been examples of porphyrin structures necklaced together with intervening bonding ligands. [Journal de Physique Colloques, 1983, 44, C3-633] or edge linked in a plane [Chem. Commun., 2011, 47, 10034, Scheme 2]. It has been noted that porphyrins have an inherent tendency to stack [J. Phys. Chem., 1995, 99, 7632, Fig. 1], but no previous worker has attempted to join porphyrin structures incorporating complexed metal atoms face to face so that there is a continuous chain of close contacting metal atoms, achieved through the method of this invention by utilizing short molecular edge linkers perpendicular to the face of the porphyrins . Other workers have only contemplated longer, extended linkers. [New J. Chem., 1999, 23, 885; Photochemistry and Photobiology, 1989, 49 (5), 531; Bull. Chem. Soc. Jpn., 2001, 74, 907; Nature, 1994, 369, 727; J Biol Inorg Chem, 2007, 12, 1235] In this one embodiment only, the metal atom is technically in its full ionic state, though the net charge of the metal-porphyrin salt adduct is neutral.

Keeping this general overview in mind, additional specific prior art references are provided below to show how they are distinguished from the various novel embodiments herein.

DESCRIPTION

As a first order of business in creating some of the new polymeric structures described above we will need to create new linear ribbon chain backbone polymers rich in bonding ligands. So that these chains will maintain a relatively stiff straight line orientation, they will be polycyclic. There are some examples of structures of so-called ladder polymers of this sort, but more anti-metal atom poor than those disclosed here, which is critical for the purpose of this application which requires a close spaced lineup of such atoms.. [G. Insulate, *Conducting Polymers, Monographs in Electrochemistry*, Springer-Verlag Berlin Heidelberg, 2012, p. 21, poly(2-Aminodiphenylamine); Protein Engineering, 1987, 1 (4), 295, Fig. 2] Otherwise most previous conducting polymers are interspersed with various single bonds. [Alan J. Heeger, MRS

Bulletin, November 2001, 900, discussing his Nobel prize in the field] It cannot be emphasized enough that any single bonds not conformationally constrained to be coplanar with the double bonds it is supposed to be conjugated with, appearing in what is intended as a conductive structure, is fatal to the theoretical potential of that conductivity.

One example is conventional polypyrrole, with pyrrole molecules linked from their 2 to their 2' (or 5', the same where the pyrrole is its own mirror image) positions. Leaving aside the influence of metal atoms for just a moment, if one would hope to create a conducting solely organic polymer, single atom bonds which can twist make the pi-transfer of electrons through a presumptively conjugated chain of alternating single and double bonds imperfect. The theoretical point of various ladder-like polymers is to lock the polymer chain in a ribbon-like plane for full conjugation. But additionally, anywhere in such a structure that an embedded benzene moiety can be looked at in isolation this becomes an electronic sticking point that is happy being its own island of resonance. And by incorporating more nitrogen atoms in particular into new ladder polymer structures, by the method of this invention we can achieve more facile pi-electron conjugation.

As demonstrated by the following:

Starting with pyrrole,3,4-diamine, a structure can be synthesized as in **Fig. 1**, which we shall call polycyclo-pyrrole (PCPy). One facile route to this objective is to reduce commercially available 1-(1-methylethoxy)-1H-pyrrole-3,4-diamine (CAS No. 927415-80-3) with LiAlH4 to the desired starting material, a quantitative reaction. Then under acidic conditions this can be electrochemically [as for standard polypyrrole, Synthetic Metals, 2014, 191, 104] and/or chemically oxidized and polymerized by $FeCl_3$ [Chem. Commun., 2012, 48, 8246; J. Phys. Chem. B, 2005, 109, 17474], ammonium persulfate [Journal of Physics: Conference Series, 2009, 187, 012050], etc., to the desired end product.

If one skilled in the art desires to synthesize pyrrole 3-4 diamine from simpler and inexpensive

starting material, 2,3-dibromo-1,4-butanol can first be THP protected to shield the alcohols. Alcohol saturated with ammonia in a bomb at 70-90 °C for 24 hours can replace the bromines with amine groups, that can then be protected with acetyl groups by reaction with acetic anhydride. With the amines so protected the alcohols can be orthogonally deprotected with mild acid. Standard Swern oxidation conditions, upon work up, yields the dialdehyde which is reacted immediately with an excess of additional ammonia to cyclize into the pyrrole. And then the amines in the now 3 and 4 positions can be finally deprotected under basic conditions under reflux.

In the synthesis of conventional polypyrrole the carbon atoms at the 2 and 5 positions are counted on to preferentially stabilize the presumed radical intermediates, due to their proximity to the electron donating nitrogen atom in the ring, through there are still side products. One would think that amines in the 3 and 4 positions of pyrrole would disturb this regioselectivity. But if we perform the reactions under acidic conditions, in the range of about 2 to 5 pH, both the primary amino groups are protenated as salts (with the amines themselves acting as buffers), and become electron withdrawing groups instead, with the deactivating reverse effect at positions 3 and 4. The nitrogen in the 1 ring position of pyrrole does not protenate under these conditions, as the existing bound hydrogen of simple pyrrole is relatively acidic to begin with, as reflected by its pKa of 16.5, due to the influence of two vinyllic connections, whereas the peripheral amines in this material have only one each, and less acidic for that reason, and not being part of the ring as well.

Given that the protonated 3,4-aminopyrrole is a polarized molecule, its orientation can be constrained in a strong magnetic, electric or electromagnetic field, or any combination of them, where each is oriented on a different axis [see for example http://arxiv.org/abs/1501.03702, physics.chem-ph, submitted for publication]. Applicant is not talking here about ordinary earth gravity or compass affecting earth magnetic fields, and neither does the reference above. Rather, applicant is necessarily talking here about fields so strong as to literally constrain the inherent Brownian motion of the molecular reactants, to force their orientation in the way they polymerize

together. Accordingly, in other embodiments the polymerization reaction can be conducted in such fields, which act to orient the resulting polymer also directionally. And it is expressly anticipated that this method can be extended to any polymerization reaction where the polarity of the reactants can in this manner assist in such specific orientation.

To further control the regiospecificity of the PCPy synthesis, another preferred route is to start with commercially available 4-amino-3-pyrrolidinol (CAS No. 77898-64-7). Here the alcohol can easily be oxided to the ketone, whereupon exhaustive alpha and gamma iodination and elimination yields 2,5-diiodo-4-amino-azol-3-one. This can be converted to the mono-boronic ester by single equivalent Miyaura borylation. Whichever iodine then goes, the intermediate products can be isolated and separated respectively, and Suzuki coupled to themselves with perfect polymer regiospecificity, whereupon conjugated imine formation by the addition of acid completes the polycyclization, and where the iodo-Suzuki coupling proceeds in quantitative yields.

Having demonstrated that the PCPy polymer can be synthesized, we will now proceed to incorporate chains of metal atoms, encouraged to assemble coordinated with such a structure by the close spaced ligands in the PCPy backbones. An elegant way of doing this is to use as an oxidizing agent an ionic metal salt of the very metal we want to incorporate. It is already known that Ag+1 ions will oxidize and polymerize pyrrole. [Synthetic Metals, 2013, 166, 57] We can use silver in this way, or alternatively Cu+2 which is close to the silver ion in reduction potential, or even Cu+1, or Ag+2 from silver (II) oxide, which is thought to consist of one silver atom in the +1 oxidation state and one in the +3, and a strong oxidizer for this reason. In this manner, as each reduction takes place concurrent with the polymerization of 3,4-aminopyrrole, by the method of this invention, as each metal ion falls out of solution in its zero oxidation state there are nitrogen ligands right there to shepherd it into position. In this case electrochemical assistance is a concurrent option. As further options we can buffer the reaction solvent with additional tertiary amines, or add non-oxidizable chelating agents, such as those known by those skilled in the art to smooth standard plating reactions. Alternatively, silver can be deposited into

fully preformed PCPy electrochemically.

The spacing of the nitrogen atoms on each side of the backbone of this new polycyclo-pyrrole material is about 360 pm, which is close to the van der Walls diameter of silver (345 pm) in its zero oxidation state. In the case of using silver or copper ions in their +1 oxidation state for the reaction, two atoms of metal are being deposited for each new nitrogen that extends the double chain on one side or another, with the possibility of another backbone chain liganding on the other side. With the +2 reagent ions it is only one atom of metal per nitrogen. Similar procedures can be carried out with other metal ions with sufficient redox potential, in particular gold and platinum, but silver and copper are the best natural conductors, with copper of course the most inexpensive and available. Less preferable, but still options, are other metal atoms in Groups 2-12 that at least can be plated out of solution.

These examples should be taken as the most simple implementation of close spaced nitrogen ligand backbones for this purpose, with two such backbone chains running tandem on each side of the molecular polymer ribbon. To achieve maximum resonance in this first case there are no points available for additional molecular connections on the liganded edge of the molecular ribbon facing out on either side. But one skilled in the art might assemble a single one of these ligand backbone edge atom chains, connected on the other side in any other arbitrary way, for connections for anchoring or other purposes, as long as the close spaced structure of the backbone itself is preserved as demonstrated.

Lest it pass unnoticed, we have further achieved by the method of this invention in this last embodiment dual modes of conductivity, by resonance through the main polymer backbone, together with conductivity through the tandem metal chains, using relatively small amounts of actual metal on a total mass ratio basis.

Also of interest are related structures in the form represented by **Fig. 2,** which though reduced by one 2-electron stage per repeat in relation to **Fig. 1** remains a fully conjugated and conducting

structure, an interesting and important point to observe. With nitrogen as the anti-metal atom, using our original starting material, this represents the variation of the PCPy already introduced with one additional substituent per nitrogen unit, in an intermediate oxidation state, were we to stop the reactions above at this point. One way to force this is to attach an additional alkyl, carbonyl, or other group to each nitrogen atom in the starting pyrrole. In this construction the structure can be seen as containing a structurally locked analog of polyacetylene, with idealized potential conductivity for that reason. Furthermore, in this case additional groups attached to nitrogen atoms can be used as linkers to other structures.

It is otherwise another objective of this invention to enable unprecedented electrical power storage capabilities, in one embodiment by the transition from the form in **Fig. 2** (still highly conductive) to the form in **Fig. 1**, and back. Consider an electrochemical cell with an acidic electrolyte and an insulating porous separator where both electrodes in the fully discharged state consist at least in part of polycyclo-pyrrole, one of which electrodes we will arbitrarily choose to be the anode and the other the cathode. Applying a charging current to this cell converts the anodic material to the form of **Fig. 2**, with hydrogen as the R group (in this half cell consuming acidic hydrogen), whereas the cathodic material is also converted to a material in the form of **Fig 2**, but with either hydroxy (with consumption of water) or the counter-anion of the acid in the electrolyte (depending on the choice of acid) as the R group (both freeing acidic hydrogen).

This is a battery with no memory effect (in its fully discharged state not even as to which terminal is supposed to be which), with potentially unlimited charging cycles, and with the electrodes formed as highly porous materials with large surface areas having immense power density. For electrode fabrication purposes, using the electrochemical synthesis method above PCPy can be deposited as a film directly onto conducting porous carbon in any form, including graphite and carbon nanotube aerogels, first allowing for the starting material to fully diffuse throughout. And to eliminate the possibility of polymer decondensation at the cathode the electrolyte can be anhydrous or incorporate alcohols instead of water. It is interesting to note that if an isopropoxide of nitrogen was to form it would be the same bond chemistry as in the original

molecular source material for our PCPy synthesis above, 1-(1-methylethoxy)-1H-pyrrole-3,4-diamine, where we began by removing the alkoxide, meaning that battery electrodes can also be formulated in their charged configurations.

Likewise parallel **Fig. 2** structures can be created with group 16 atoms like sulfur and oxygen, in other embodiments using alternate synthesis methods because conversion of those atoms to electron withdrawing groups is less facile than with nitrogen substituents in the 3 and 4 positions. In the case of sulfur there are examples in the scientific literature of short oligomers limited to as many as eight sulfur atoms so arranged, but no attempts at full polymerization. [Chem. Asian J. 2009, 4, 1386, 1395, Fig. 6}. Such short constructions will not conduct very far, a critical difference if conductivity is the objective, such that for this purpose polymers have a fundamentally different character from what are called oligomers.. To achieve a proper and full polymer, by the method of this invention, 3,4-thiophenedithiol (CAS No. 87207-45-2) can be selectively brominated in the 2 and 5 positions, in one preferred embodiment the loose thiols can be protected as a thio-acetal, and then Rieke zinc at -78 °C ,and subsequent treatment with the nickel catalyst Ni(dppe)$Cl_2$, will effectuate the 2-2' polymerization. [J. Am. Chem. Soc., 1995, 117 (1), 233]. Deprotection of the thiols under acidic conditions then completes the double cyclization into polycyclo-thiophene, PCTh, with condensation on conjugated thione intermediates. Alternatively, one of the thiols could be replaced with hydroxy, and following the Miyaura-Suzuki scheme described above for PCPy achieves a parallel result. Higher oxidation states of polycyclo-thiophene, with oxygen atoms on sulfur can also support battery applications for example in the charged state with the PCTh just described as the anodic material, and with the sulfur atoms oxidized to their +6 state, bonded also to two oxygens, as the cathodic material, and in one embodiment the form in **Fig. 2** can be used alone. In the case of a PCPy based battery, parallel oxidation states are also viable.

In the paragraph above, applicant is clearly teaching by contrasting example with the reference to Chem. Asian J. 2009, 4, 1386, that the number of repeating units in the brackets must be more than eight, and optimally substantially more, if again, conductivity is the objective. This clearly

applies therefore to all the conductive polymers taught herein, as illustrated by **Figs 1-4,** and **Fig 6,** with the number eight being the "n" repeating number in the figures, for any other interpretation would defeat the objective of the invention, which again is improved conductivity over previously known conductive polymers.

Moreover it should be clear, from the most authoritative definitional distinction between the words "polymer" and "oligomer", found in Polymer Science Dictionary, by M. Alger, Second edition, Chapman and Hall, 1997, Library of Congress catalog Card Number 96-86111, on page 350, a functional difference applicant has already gone out of his way to emphasize, that for the purposes of this invention a "proper and full polymer" is understood to be comprised of at least 50 repeating units, more optimally, in each respective case. And applicant expressly states this herein lest there be any confusion about what these terms mean in context..

Furthermore, applicant also anticipates that the longer the unbroken polymeric chains are the better will be the conductivity result. Again, under the synthesis conditions presented, one skilled in the art should recognize that the chains will continue to extend until the starting materials are consumed. So most optimally the number of "n" repeating units in the polycyclic chains might be 1000 or more.

By similar means a polycyclo-Fran product incorporating oxygen atoms is also available, using furans in the form of enol ethers in the 3 and 4 positions, and dehydrating conditions for the final condensations. Such enol ethers as a path to the nitrogen, sulfur and other analogs, in one embodiment by condensing them with ammonium acetate after deprotection. And corresponding structures with other Group 15 and 16 atoms can also be contemplated by these means, including mixing anti-metal atoms in the same polymer, though the full functional beauty of these new structures as conductive polymers is found in the perfection of their symmetry.

It is even possible to incorporate metalloids in these structures, for example with silicon as the anti-metal atom with two methyl groups each. 1,1-dimethylsilole is a known compound, and

stable at -78 °C, slowly forming Diels-Alder dimers at room temperature. [J. Organomet. Chem., 1981, 209, C25] Additional substitutents on the ring carbons provide additional stability. Accordingly, starting with commercially available 1,1-Dimethyl-2,5-dihydro-1H-silole (CAS No.16054-12-9), treatment with one equivalent of BuLi creates an anion in the 3 position where even with the beta silicon effect the hydrogens on the alkene are still more acidic than the secondary alkyl hydrogens in the 2 and 5 positions. This can be silated with dimethyl-trifluoromethyl-chlorosilane (or alternatively dimethylmethoxychlorosilane), with inverse addition of the anion to preferentially expel the chorine. Exhaustive iodination (or bromination) and elimination with non-nucleophilic base adds iodines (or bromines) in the 2 and 5 positions and completes the oxidation to the full silole, with now 2 double bonds, which opens the door to conversion first to the mono-boronic ester by Miyaura borylation. Whichever iodine then goes, the intermediate products can be isolated and separated respectively and Suzuki coupled to themselves with perfect polymer regiospecificity, whereupon treatment with strong non-nucleophilic base abstracts the sole remaining vinyllic hydrogen (pKa 43) of each silole unit in the 4 position slowly, with then fast nucleophilic attack on the adjacent 3'-silyl group, ejecting a trifluoromethyl anion (conjugate acid pKa 25-28) to complete the polycyclization to polycyclo-silole, PCSi. Alternatively, the silyl linkage polymerization can be performed first to avoid the possibility of cross-linked products, in one embodiment with the addition of halides in the 2 and 5 positions subsequently. Solubility of the polymer product in all such embodiments where there is room for substituents on the anti-metal ring atom can be enhanced by attaching longer substituents than methyl to it, including alkyl chain and ether linkages, sulfate termination, etc.

Another route to PCSi is from 1,1-dimethyl-2,5-iodo-3,4-dimethylmethoxysilyl-silole, obtained in a parallel manner as just above, which can then be polymerized with acetylene under Sonogashira conditions, preferably by reacting with a large excess of the acetylene first to isolate the 2,5-ethynyl derivative, and then repeating the Sonogashira reaction with an equal equivalent of the previous di-iodo material. This polymer will then undergo dual silyl internal ring formation on each of the acetylenic units by treatment with lithium naphalenide, followed by iodine quenching. [J. Am. Chem. Soc., 2003, 125 (45), 13663, Scheme 2] Here again

trifluoromethyl anion can be the leaving group from each new silyl linker, an innovation by this applicant to boost yields, as it will only be disturbed by a strong carbanion in close quarters..

Moreover, it is expressly anticipated that these same principles could be extended to any other polycyclo-metallole. Those in the form of **Fig. 2** where the anti-metal atom can sustain three covalent bonds or more, if hydrogen or other labile substituents are employed, can be further oxidized to the form of **Fig. 4**, replacing what was the nitrogen of PCPy in that form. They can even be interconverted amongst themselves, for example by reaction with phenylboron dichloride to produce polycyclo-borole, PCBo. Polycyclo-phosphole, PCPh, is another material with battery potential given the facile multiple oxidation states of phosphorus, as for the PCTh battery chemistry example above. Indeed, for battery material purposes these same principles can be extended to any other conducting polymer that will undergo redox reactions.

It is further the insight of this applicant that all the chain creation reactions described herein are perhaps less than optimally performed in conjunction with stirring, which tends to tangle the growing chains, whereas what we want in various embodiments are highly ordered structures, in principle the more crystalline the better. For this reason a two-compartment reaction device may be used to minimize turbulence, separated by a membrane or other porous separator permeable to some reactants but not other larger ones. So for a typical example in the case just above, a key small molecule component of the metal coupling reaction, in one embodiment an activating base for a platinum or palladium chloride derivative, can be added to one compartment and allowed to diffuse slowly into the other where the reaction takes place.

Likewise, parallel procedures to those employed for our PCPy can be applied to the production of the novel polycyclo-pyrazine (PCPz), **Fig. 3**. In one embodiment the penultimate material is 2,3,4,5-tetraaminodihydropyrazine, a previously unreported compound. But starting with commercially available 2,2-diaminoacetic acid (CAS. No. 103711-21-3), this is first double BOC protected, and then converted directly into the amide using $B(OCH_2CF_3)_3$ and an excess of ammonia [J. Org. Chem., 2013, 78 (9), 4512], which after deprotection can then be self cyclized

using $Et_3OBF_4$ [by analogy to J. Org. Chem., 1968, 33 (4), 1679]. This tetraaminodihydropyrazine will undergo a trans-amidine condensation under the same conditions as for polycyclo-pyrrole above, and then can be electrochemically oxidized to polycyclo-pyrazine standing alone, or by using oxidizing metal atoms, again as above, including for the parallel purpose of laying down coordinated linear chains of metal atoms.

Moving to the stanene objective, or what in the first instance is more properly described as a decorated stanene (with one anti-metal substituent per tin atom), it is already known that polymerizing tin with various di-alkyl or aryl substituents does not lead to stable products, being both light and moisture sensitive. So before even attempting our own tin atom polymerizations of any kind, we can promote the stability of our end products by using more electron donating functional groups, preferably alkoxy, though secondary amine, amide, ester, sulfide, or other any other such electron donating group can be used, the purpose being to stabilize by induction the tin to tin bonds, where the bond between the metallic atom and the anti-metal substituent is through an anti-metal atom in Groups 15 and 16. Groups like alcohols, thiols and primary amines lead to other cross-linked embodiments, requiring half the number of total substituents overall. And we will not perforce exclude the halides in Group 17, because they exert a dipole effect, as do all these other functional groups just mentioned. These are the substituents which will be claimed in all the related embodiments below, with the exception of dichloro on silicon, which is known.

The dipole effect we speak of is related to the anomeric effect in sugars. According to theory, there are two competing considerations there. First, in cyclo molecules with more bulky substituents steric effects will favor having them in the equatorial positions, precisely what we don't want for the formation of two-dimensional sheet structures. Second, where the substituent is electronegative, a dipole is created which will favor opposing axial orientation between adjacent ring atoms, so that the dipoles do not repel. This latter effect is more pronounced in non-polar solvents. We eliminate the first concern in two ways by the method of this invention, by keeping the substituents sterically small, and by taking advantage of the longer bonds between

metallic atoms in the rings, longer than the carbon-carbon bonds in sugars. Second, because the electronegativity difference between metals and our anti-metal substituent connecting atoms is greater, all other things being equal, than their electronegativity difference from carbon, the dipole effect is stronger than in the sugar model. Both these considerations now favor axial positioning, and have been theoretically ignored by previous attempts to use large alkyl and aryl substituents with minimal electronegativity differences in the connecting bond atoms. In addition, certain substitutents like amides offer inter-substituent hydrogen bonding possibilities which work further in our favor.

But starting for example with trichloromethoxystannane, available from reacting tin tetrachloride with 1/4 equivalent of methanol, this can polymerized electrochemically, or by means of a dissolving metal reduction, to yield the methoxy decorated stanene. Sonification helps to drive these reactions to completion. Alternatively, this same starting material can be reduced to methoxystannane (the trihydride) with $LiAlH_4$, and then deposited by dehydrocoupling, or CVD. There is one example in the scientific literature of the accidental incorporation of some methoxy in what was intended as a purely mono-alkyl polystannane, because unreacted chlorines were quenched with methanol. [Polymer, 2000, 41, 441, Fig 2c]

It is worth noting again that the few previous attempts that might have resulted in mono-substituted polystannanes by dehydrocoupling have yielded linear polymers with one hydrogen remaining on board each tin atom, because the catalyst was too bulky to proceed further [J. Organomet. Chem., 1985, 279, C11], or else have resulted in network polymers. [Macromolecules, 1990, 23, 3423; Electrochimica Acta, 1999, 45, 1007] For this reason, the smallest possible dehydrocoupling catalysts are recommended according to the method of this embodiment, to minimize steric hindrance, for example platinum or palladium halides (which are then hydride or base activated in situ). All these transition metal catalysts are most efficient when coordinated at least in part to electron donating ligands, including various amines, imines

and nitriles, which can be multi-dentate. This was what is referred to by a "small complex dehydrocoupling catalyst," specific preferred examples of which would include coordinating the metal with two acetonitrile ligands, diammine, (1E,2E)-N,N'-dimethyl-1,2-ethanediimine, TMEDA (tetramethylethylenediamine), and similar small footprint molecules.

The stability problem with previous linear polystannanes once synthesized is that they decompose into cyclic structures. But in this embodiment it is our aim to create extended cyclic structures as the most stable form. Other polymerization conditions are known to those skilled in the art, presuming the selection of starting materials taught by this application is followed.

To obtain mono-halogenated products, in one embodiment fluorotrichlorostannne is the starting material, made by reacting tin tetrachloride with a 1/4 equivalent of a fluoride salt in a nucleophilic reaction. Because the redox potential of fluorine is greater (and its bond to tin stronger) than that of chlorine, it is then possible to remove the chlorines selectively by control of the driving voltage across the electrochemical cell. This enables a path to a structure which was heretofore purely theoretical. And from fluorostannane, dehydrocoupling and CVD are also options.

However arrived at, as a decorated structure with mono substituents in alternating anti positions, these form a buffer layer on the surface of the two-dimensional structure, which tends to passivate it, and the two-dimensional layers can then assemble into a bulk three-dimensional material, as does graphene in graphite.

In another exemplary embodiment we can arrive at fully oxidized stanene, with alternating aromatic type double bonds, by then doing elimination of these decorations. So for example, halogen decoration can be removed with hydrides or in a dissolving metal reaction, and then the whole structure can be oxidized using catalysis by base, transition metal dehydrogenators, etc.

As an alternative, a bromine decorated stanene can be subjected to ½ equivalent of LiAlH4 to

remove ½ the bromines, and in the presence of a tertiary amine or other non-nucleophilic base the other half of the bromines can be eliminated with extended resonance mechanisms. One starting material for this purpose, bromostannane, can be obtained by dropwise inverse addition of three equivalents of sodium bis(2-methoxyethoxy)aluminumhydride (Red-Al) in toluene to tetrabromostannane in the same solvent under inert atmosphere, with the reaction being driven also by the precipitation of NaBr. The addition is slowed near the end of the addition to minimize full reduction to the pyrophoric stannane gas, whereupon the bromostannane (highly flammable if not pyrophoric itself) boils off at a low temperature as it forms, and can be condensed at 0 °C directly into a second connected flask containing the dehydrocoupling metal complex catalyst right there.

And these same principles can be extended to any of the other Group 14 metals and metalloids which will form tetrahedral covalent bonds. For example, methoxysilane (CAS No. 2171-96-2) is commercially available, and can be used as it comes for dehydrocoupling or CVD as already taught herein. Similarly, one skilled in the art could substitute in the coupling reactions any other functional groups besides hydrogen or halides that can be reduced off with the generation of metal to metal bonds.

We now endeavor to synthesize stable linear polymetal chains. In contrast to the known (and known unstable) di-alkyl and di-aryl polystannanes, parallel attempts to incorporate the other substituents taught above (other than chlorine in the case of silicon) are conspicuously absent from the research literature. Here the electron donating properties of most of the anti-metal substituents already mentioned tend to strengthen the metal-metal bonds, making these compounds more stable. In the case of the Group 14 metals and metalloids, we can simply use the above procedures on the di-substituted metal compounds, dimethoxydichlororstannane, dimethoxystannane, etc. In addition, with the latter, dehydrocoupling, in this case using a sterically hindering catalyst like Wilkinson's catalyst (the optimum "large complex dehydrocoupling catalyst") to discourage cyclization, is a favored embodiment for removing hydrogens. The evolving hydrogen produced can be allowed to simply boil off, or be captured

with a sacrificial alkene like cyclohexene.

As other means of encouraging linear chains, liganding and sterically guiding helper molecules can be used also in alkali metal reductions, for example crown ethers in liquid ammonia, and these same principles apply to electrochemical working solutions as well, again using smoothing chelating agents. Both these are examples of using molecular structures to semi-protect the metal atoms until they form metal to metal bonds. Furthermore, it is also possible to pre-synthesize seed chains of more than six metal atoms in length, separate out any cyclized product, and then extend those seed chains by dropwise addition of more starting material, where extension of the seed chains is then favored over cyclization reactions.

In other embodiments, the new one and two-dimensional structures taught herein can be co-deposited with electrically insulating molecules, to enhance the isolation of the conducting metal channels. For example silicon dioxide can be dissolved in superheated water at 340 °C, and then cooled to drop out of solution interspersed around the linear chains, or between the two-dimensional stanene layers already realized.

Extending these principals to the Group 13 metals, here tetrahedral boding is not an option, so we will first consider mono-substituted metals for chain formation. In the case of aluminum, the choice of alkoxy substituents is again considered to be the most stable at normal temperatures, both as an end product, and manageable under the various reaction conditions above. Highly electronegative substituents like fluorine must be handled with care at least until the metal atoms are consolidated into a bulk solid material, as when mono or di-substituted they are more reactive than pure aluminum, which itself is flammable as a finely divided powder. But the formulation will work for any of the substituents considered above for poly-Group 14 applications. And discouraging ring cyclization by any of the means just above again favors linear chains.

In a typical procedure, aluminum tribromide is reacted with one equivalent of methanol in otherwise dry organic solvent added dropwise to produce methoxydibromoalane. This can then

be coupled electrochemically or by dissolving metal reduction. Or the remaining bromines on the methoxyalane can be reduced off by NaH, and subjected to either dehdrocoupling or CVD again as above. Alternatively as an intermediary product a mixed halo alkoxy alane can be reduced with a pure aluminum hydride like $NaAlH_4$, which after giving up a hydride equivalent becomes incorporated as part of the product, and then redistributed in the reaction itself. In this latter case, for example, if the objective was the equivalent of one alkoxy substitutent per aluminum atom, equal portions of $Al(OMe)_2Br$ and $NaAlH_4$ would be combined to achieve that net end proportion. Whether by redistribution for not, the polymer starting material can be isolated and purified, demonstrating the advantage of these methods for exact control over the number of substituents per metallic atom. One skilled in the art will now appreciate that by the method of this invention any intermediary proportion of anti-metal substitutents can be achieved down to what would be considered mere doping level.

These are the first polyaluminum organometals, and clearly distinguished from Flagg, et.al.[US 3508886, already cited], both in method and end result. Flagg claimed a “polymer” produced by reacting various aluminum hydrides with HF gas. All that could ever hope to accomplish would be the replacement of hydride substituents with fluorine substituents on the aluminum atoms, and regardless of any other substitutents would in no case reduce them to create actual metal to metal bonds, but instead an ionic network. And when Flagg attempted his method with pure aluminum trihydride [his Example 2] the reaction went further awry by reacting with and incorporating the THF solvent used as a third substituent (in addition to two fluorines on each aluminum atom), with apparently no room provided for metal-metal bonds.

It must be recognized that once deposited the linear chains of polyaluminum taught herein can be thought of as associating with other chains, each conducting electron exchange as in a true metal. In this manner these one-dimensional structures assemble themselves into three-dimensional bulk materials. This is not only true of the mono-substituted product, as bonding either one or two substituents only to an aluminum atom will tend to predispose it to coordination type bonding to other aluminum atoms, more like the transition metals. Any metal atom that will tri-bond can be

used by the method of this invention in a similar way. Moreover, with regards to all the one and two-dimensional polymetallic structures described above, alloys mixing combinations of different metallic atoms are also anticipated embodiments.

Lastly, another application of ligand coordinated structuring of metal to metal atom contact will now be demonstrated in the form of close perpendicular edge linking of metal ion porphyrin complexes. In biological systems, a metal ion in such an environment, already coordinated to four nitrogen atoms, will readily accept electrons from additional electron donating ligands, like molecular oxygen or carbon monoxide. In a similar manner, when such metal ions are held in direct proximity, they can transfer elections from one to another, conducting electricity.

To create these structures we will require functional group substituents on the periphery of the porphyrin complexes for linking purposes. In one preferred embodiment, a Grignard reagent is made from 2-bromopyrrole (CAS. No. 38480-28-3). This can then be reacted with pyrrole-2-carbonyl chloride (CAS No. 5427-82-7) to give the ketone, which when reacted with ammonia to give the primary ketimine can then be reduced to the amine by sodium cyanoborohydride, or alternatively formic acid. With that in hand, reaction with any simple aldehyde will complete the four sub-unit cyclization to a porphyrin type structure. If desired the peripheral amine function can be protected during the ring formation, or the ketones first formed can be protected as ketals and reduced to amines at the end.

This product can then be complexed with Cu+2 ion to give copper porphyrin with amino groups ending up in the 5 and 15 positions according to porphyrin structure numbering, **Fig. 5.** Perpendicular linking and stacking of the porphyrin units, **Fig. 6**, can then be achieved by dropwise addition to them of two equivalents of a phosgene equivalent, and where any discontinuities are healed by the liberated chloride ions regenerating phosgene with the ejection of trisubstituted nitrogen as a leaving group.

We note that the linking distance across the linked nitrogens is180 pm in this case, very close to

the size of the Cu+2 ion, so the stacking distance is optimum. Moreover, if any elemental copper was to be formed, the size of copper in reducing to its zero oxidation state increases to 280 pm, no longer a good fit for the liganded porphyrin central cavity, and will be displaced by another copper atom still in the ionic state, or will be reoxidized in that highly conducive environment.

With this close perpendicular linking teaching in mind, one skilled in the art might adopt any manner of other linking strategies suitable for single chain polymers, using other linking functional groups or other positions on the periphery of the porphyrin complexes, for example radical initiated vinyl chloride in place of the amine linking points, or including additional linking points at the 10 and 20 positions for tetra-linking. Likewise the porphyrin derivatives could be extended with additional peripheral structures as long as the core four ligand arrangement remains intact, and other double bonds could be moved around or hydrogenated in any arbitrary manner that does not disturb the bonding state of the core nitrogens themselves, though a carbaporphyrin is allowed by less preferred. Parts of the porphyrin structure could even be cut away and replaced with other linkages, or other anti-metal atoms substituted, as long as the result is a flat stable structure.

Furthermore, beyond copper the principle of this structure can be extended to any other metal ion that will similarly complex with a porphyrin, including silver, which in the porphyrin cavity environment is oxidized to the +2 state, magnesium, iron, etc. In another embodiment, the attachment of electron withdrawing or electronegative groups, for example fluorine or trifluoromethyl, to the periphery of the porphyrin, including positions 2, 3, 7, 8, 12, 13, 17, and 18, will tend by induction to reduce the bonding distance of the ligand nitrogens, so as to better accommodate slightly larger ions.

Simply stated, what is claimed in this last embodiment category are essentially four atom ligand coordination units (porphyrin equivalents) containing a complete metal ion, linked directly together with polymer chains perpendicular to the plane of the complete units so that the successive metal ions are in electronic contact distance with each other. This stack represents the

first true nanowire with a core of exact one single chain of metal atoms.

Taken together, all of the embodiments above teach related methods of using coordinating ligands, dipole effects, and/or sterically controlling functional groups to structure metal atoms joined in direct contact in one and two-dimensional, even and regular structures, stabilized by appropriate electron donating effects, to maximize their conductivity potential on a quantum level. The nitrogen ligand backbone structuring polymers required for guiding some of these structures have their own conducting and metallic character, and can be used separately for that purpose, as can related structures with other anti-metal atoms. And we should also point out before concluding that any of these structures can have their conductivity enhanced by doping, as is already known for different but chemically comparable compositions by those skilled in the art.

Those skilled in the art will appreciate that the present invention may be susceptible to variations and modifications other than those specifically described. It will be understood that the present invention encompasses all such variations and modifications that fall within its spirit and scope.

CLAIMS

I respectfully claim:

1. A polycylic metallole heteroatom rich conductive long chain polymer comprised of the repeating unit in the brackets in either **Fig. 2,** where M is the heteroatom and R is anything, shown herein as formula 2 depicted as




or **Fig. 4**, where M is the heteroatom and R is anything, shown herein as formula 4 depicted as



where there are more than eight repeating units, and where the metallole heteroatom is nitrogen.

2. The polymer of claim 1, where metal atoms in the zero oxidation state, in tandem conductive chains, are co-deposited with and coordinated to the heteroatoms in the polymer, one atom of metal per nitrogen.

3. The polymer of claim 2, where the metal atoms are either silver or copper.

4. The polymer of claim 1 used to store electrical power.

5. The polymer of claim 4, where the polymer participates in a redox reaction as a component in the anode or the cathode of a battery.

6. The polymer of claim 1 where the polymer is produced under the influence of magnetic, electric and/or electromagnetic fields strong enough to orient the polymer molecules directionally.

21 A polycylic nitrogen rich conducting long chain polymer comprised of the repeating unit in the brackets in **Fig. 3,** shown herein as formula 3 depicted as



where there are more than eight repeating units.

22. A polycylic metallole heteroatom rich conducting long chain polymer comprised of the repeating unit in the brackets in either **Fig. 2,** where M is the heteroatom and R is anything, shown herein as formula 2 depicted as




or **Fig. 4**, where M is the heteroatom and R is anything, shown herein as formula 4 depicted as



where there are more than eight repeating units, and where the metallole heteroatom is other than nitrogen.

23. The polymer of claim 22, where the polymer participates in a redox reaction as a component in the anode or the cathode of a battery.

24. The polymer of claim 1, where there are at least 50 repeating units, consistent with the plain meaning distinction between the scientific definitions of the words “oligomer” and “polymer.”

25. The polymer of claim 21, where there are at least 50 repeating units, consistent with the plain meaning distinction between the scientific definitions of the words “oligomer” and “polymer.”

26. The polymer of claim 22, where there are at least 50 repeating units, consistent with the plain meaning distinction between the scientific definitions of the words “oligomer” and “polymer.”

27. The polymer of claim 1, where there are at least 1000 repeating units.

28. The polymer of claim 21, where there are at least 1000 repeating units.

29. The polymer of claim 22, where there are at least 1000 repeating units.

ABSTRACT OF THE DISCLOSURE

A number of new classes of polymers with the potential for electrical conduction are introduced sharing a common theme, having metal atoms in direct contact with each other, bound in one and two-dimensional structures guided by steric, dipole and coordinating ligand factors. These new classes include a new family of metallole polymers in a polycyclic arrangement, both standing alone and with chains of metal atoms coordinated to their electronegative backbone atoms, new polymers of group 13 and 14 metals and metalloids, with substituents connected through an electronegative bonding atom, and a new class of close stacked porphyrin polymers, assembled with short molecular linkers perpendicular to the faces of the porphyrin units. These new materials empower new classes of capacitors, batteries and electrical conductors, even superconductors.

CERTIFICATE OF SERVICE

I certify that I served a copy of this Opening Brief of Appellant on counsel of record on December 7, 2023 by electronic means (CM/ECF), together with a joint appendix opposing counsel graciously assembled and provided for me, also being filed herewith.

Dated: December 7, 2023

/s/ The Pen

The Pen
Appellant Pro Se
954 Palm Ave., #103
West Hollywood, CA 90069
Tel: (310) 360-0640
dc@thepen.us

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the applicable type-volume limitations because it contains 5,404 words, including title page, tables, all content and certificates, but not including the addendum. This certificate was prepared in reliance on the word-count function of the word-processing system (WordPerfect 2021) used to prepare this brief.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Corel WordPerfect 8.0 in 14-point Times New Roman font.

Dated: December 7, 2023

/s/ The Pen
The Pen
Appellant Pro Se