2023-2282

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

IN RE: PEN

APPLICATION SERIAL NO.: 16/104,878
FILED: AUGUST 18, 2018
FOR: TRUE NANOSCALE ONE AND TWO-DIMENSIONAL ORGANOMETALS CONTINUATION

---

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board
Appeal No. 2022-001764

---

REPLY BRIEF OF APPELLANT

---

The Pen
954 Palm Ave., #103
West Hollywood, CA 90069
Tel: (310) 360-0640

*Pro Se*

March 18, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

SUMMARY OF THE REPLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1. *Amgen v. Sanofi* Is Categorically Distinguished Because There They Had No Common Core Structure At All, While Here The Function Is Based Entirely On Core Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2. The Specification Provides The Starting Material And Reaction Conditions For Enabling The Keystone Member Of The Class, Which Necessarily Enables Other Members Of The Class With The Same Basic Core Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

3. Examiner And The Director Have Now Had Two Opportunities To Dispute Pen's Contentions About What One Skilled In The Art Would Know *A Priori,* And Have Failed To Do So . . . . . . . . . . . . . . . . . . . . . . . . 11

4. The Director's New Argument On Appeal On The "x" Number Of R Groups Is Not Only Untimely, It Is Greatly Exaggerated . . . . . . . . . . . . . . . . 12

5. If The PTAB Can Make A *Sua Sponte* Argument After The Case Is Submitted To Them, Surely Pen Can Offer His Rebuttal Here. . . . . . . . . . . 13

6. A Working Example Is Not Mandatory To Enable A Patent Application . . 16

7. With Regards To The *Wands* Factors The Bottom Line Is the Standard Of Undue Experimentation, And That Is Controlled By *Genentech* . . . . . . . 17

8. From The Very Beginning Of The Parent '829 Application The Claims In This Case Have Been For A Long Chain Polymer . . . . . . . . . . . . . . . . . . 18

9. Pen Provided Multiple References In The Specification With Reagents And Conditions For The Synthesis, And Fukuzawa Wasn't One Of Them . . 21

10. The Director's Wild Chemistry Speculations Can't Even Be Considered . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Allergan, Inc. v. Sandoz Inc.*,
796 F.3d 1293, 1310 (Fed. Cir. 2015) .... 4, 16

*Amgen v. Sanofi*,
598 U.S. 594 (2023) .... *passim*

*Angstadt, In re*,
537 F.2d 498, 504, 190 USPQ 214, 219 (CCPA 1976) .... 17

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
750 F.2d 1569 (Fed. Cir. 1984) .... 17

*Baxter Int'l, Inc., In re*,
678 F.3d 1357 (Fed. Cir. 2012) .... 13

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) .... 15

*Gartside, In re*,
203 F.3d 1305 (Fed. Cir. 2000) .... 15

*Genentech, Inc. v. Novo Nordisk A/S*,
108 F.3d 1361 (Fed. Cir. 1997) .... 4-5, 17-18

*Google Tech. Holdings*, *LLC, In re*,
980 F.3d 858 (Fed. Cir. 2020) .... 13

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) .... 23

*The Incandescent Lamp Patent*,
159 U.S. 465, 16 S.Ct. 75 (1895) .... 2, 11

*Wands, In re*,
858 F.2d 731 (Fed. Cir. 1988) .......................... 4, 6, 11, 17-18, 22

*Wright, In re*,
999 F.2d 1557 (Fed. Cir. 1993) .............................. 3, 14-15

**Other Authorities**

MPEP § 2145 (9th ed. Feb. 2023) ....................................... 23

*Properly Presenting Prophetic and Working Examples in a Patent Application*
86 FR 35074 (07/02/2021) ........................................ 16-17

**Other Materials**

U.S. Patent Application No. 14/738,829 ...................... 5, 16, 18-19, 21

U.S. Patent Publication No. 20100305288 (He, et. al.) .................. 19-21

## SUMMARY OF THE REPLY

The brief submitted by the Appellee - Director of the United States Patent And Trademark Office ("Director") is wrong on both the facts and the case law, for all the following reasons, including but not limited to:

*First,* the Director argues that *Amgen v. Sanofi* represents a parallel set of facts where there was also a "common core structure" akin to the claims in this case. Brief of Appellee, page 9.[1] The exact opposite is true. As clearly distinguished from the relatively limited class in this case, the claims in *Amgen* were for a "**vast"** potential collection of "**complex three-dimensional shapes"** that were "**incredibly diverse"** and entirely "**unpredictable**." *Amgen v. Sanofi*, 598 U.S. 594, 599-601 (2023).

*Second,* Pen had argued that he stood accused by the Examiner of not providing the chemical reagents and reactions that may be used to synthesize the claimed metallole polymers. Opening Brief, page 18. The Director counters by stating rather that "the Examiner simply found that the information in Pen's specification is not sufficiently tailored to enable metallole polymers having ***any***

[1] The Director states that Pen "relies" on *Amgen*. Actually, Pen asks this court to **distinguish** this case from *Amgen*, a case that was not even before the PTAB in the argument below, and was only cited by them *sua sponte* after that argument was submitted.

substituent R group." Brief of Appellee, page 11 (emphasis original).

For the purposes of this appeal, by adopting the position above what the Director has effectively done is concede that the disclosure in the specification does in fact enable at least one embodiment of the class. And that being the case, the rest of the class is enabled if it shares "**some general quality**" throughout the class that gives it "**a peculiar fitness for the particular purpose**," which in this case is the conductivity of the core backbone. *Amgen* citing *The Incandescent Lamp Patent*, 159 U.S., at 475, 16 S.Ct. 75 (1895)[2] (emphasis supplied).

*Third*, Pen contended to the PTAB below, **and has again already contended here,** that "one skilled in the art" would already be familiar with, and would anticipate, the two simultaneous reactions that comprise the synthesis; 1) the polymerization of monomers based on pyrrole, and 2) the concurrent amine substitution that is favored by the positioning of the amines in the 3 and 4 positions in this case. Appx156, Opening Brief, pages 16-17. **Neither the Examiner, nor the Director, has ever disputed these contentions**, which now stand as doubly undisputed. And that being the case there is nothing deficient in this application with regards to the **theory** of the synthesis.

---

[2] Here again, *Incandescent Lamp* is a case that is distinguished from the facts of this case, where in *Incandescent Lamp* there was no "general quality" found in their set of facts.

*Fourth,* for the first time on appeal the Director argues that the specification is defective because the exact "x" **number** of R groups is not specified. The Director makes this new point repeatedly, over and over, as if it was alone dispositive. Brief of Appellee, pages 5, 6, 7, 9, 10, 14, 15, and 22. But Examiner failed to make such any argument, either in the final rejection of this '878 application,[3] or to the PTAB. Worse yet, the Director misrepresents to this Court that the PTAB opinion incorporated this rejection point. Brief of Appellee, page 15. In any case, such an argument cannot be heard now.

*Fifth*, the Director argues that Pen should be precluded from making reasonable common sense arguments that no lay person would ever dispute, let alone one skilled in the art, distinguishing the facts of this case from *Amgen* and *In re Wright,* 999 F.2d 1557 (Fed. Cir. 1993). Brief of Appellee, page 19. Since neither of these cases were argued below, and were only cited by the PTAB itself *sua sponte* after the fact, of course Pen must be permitted to tender his counter arguments. Here the Director perhaps fails to grasp that their own proposed standard of what "a reasonable mind might accept as adequate to support a

---

[3] In the first office action in the prosecution of this '878 application, Examiner asked Pen to simply clarify in the claims that the"x" was in fact the number of R groups, even as he conceded he already knew what Pen intended. Appx094. The question played no part in the final rejection and never came up again.

conclusion" must cut decisively in Pen's favor here. Brief of Appellee, page 13.

*Sixth*, the Director puts great emphasis on the question of a "working example" as if, again, this was alone dispositive **against** Pen. Brief of Appellee, pages 1, 3, 7, 10, 15, 17, 22 and 23. But while under *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) this can be a factor **in favor** of an enablement argument, **the possible lack of a working example is not a demerit**. *See*, e.g. *Allergan, Inc. v. Sandoz Inc*., 796 F.3d 1293, 1310 (Fed. Cir. 2015)

*Seventh*, virtually all of the *Wands* factors were framed by Examiner as "undue experimentation" questions. Appx181, 182, 183, and 185. And the Director argues the same thing here, over and over. Brief of Appellee, pages 6, 7, 8, 11, 14, 15, 18 and 21. Indeed, the only analysis the PTAB even did of the factors in the *Wands* case was to quote this expression. Appx007. But the Director offers this Court no actual quantitative guidance whatsoever on the question of what may or may not constitute "undue" experimentation in the context of a chemical synthesis. **Whereas, Pen has already provided that guidance,** by his citation, on this precise point, of the controlling case, *Genentech, Inc. v. Novo Nordisk*, 108 F.3d 1361 (Fed. Cir. 1997). Opening Brief, page 21. There it was held that experimentation was "undue" only where, in stark contrast to the facts in this case, there is "no disclosure of any specific starting material or

of any of the conditions."[4] *Id.* at 166.

*Eighth,* the specification of this '878 application expressly teaches that the length of the polymer is potentially unlimited, teaching that "under the synthesis conditions presented, one skilled in the art should recognize that the chains **will continue to extend until the starting materials are consumed.**" Appx055 (emphasis supplied). At no time did Examiner object to this, or make it a part of his final rejection, or any argument to the PTAB. It was the invention of the PTAB itself *sua sponte* to make this argument against Pen after the fact of submission of the case to them. And despite the Director's opportunistic attempt to latch on to this point, Brief of Appellee, pages 1, 5 and 9, it further flies in the face of the science of polymerization that is already before this Court.[5] Opening Brief, pages 8-9.

*Ninth*, the Director would have this Court read the "state of the prior art"

---

[4] So again, this case is distinguished from the facts in the *Genentech* case. And it must be good law, because this exact case was cited by the PTAB in their decision on another point. Appx007.

[5] It's not as if a proper definition of the word "polymer" wasn't already part of the record, going all the way back to the parent '829 application. Appx221. And it's in the pending '878 application as well. Appx055. It was only because the PTAB overstepped in this way, with such a blunder of basic polymeric science, that Pen was compelled to ask this Court to additionally take judicial notice of relevant and correct definitions.

factor in *Wands* as limiting inventions to things that have already been invented. The Examiner literally argued to the PTAB that Pen's disclosure was insufficient because the Fukuzawa reference in particular would not enable Pen's invention Appx181-182, which the Director echos here over and over. Brief of Appellee, pages 1, 4, 6, 10, 15 and 16. It cannot be known if the PTAB even considered this, because their opinion does not analyze the *Wands* factors at all. But clearly, Pen only cited this reference (Chem. Asian J. 2009, 4, 1386, 1395) as **an example of an inferior formulation that could not possibly work for the conductive purpose of this invention**. Appx054. Instead, the "state of the prior art" *Wands* factor here is comprised of the standard pyrrole polymerization and amine substitution reactions which are undisputably known to those skilled in the art for the purposes of this appeal. *See Fourth*, *supra*.

*Tenth*, with no scientific support whatsoever, for the first time on appeal the Director argues the utterly preposterous theory that some R side group might "adversely affect" the electroconductivity of the backbone chain. Brief of Appellee, page 10. Not only are such new arguments on appeal improper, the basis of the conductivity is clearly explained in the specification, and it has nothing to do with any R group. Appx049, lines 6-16.

*Eleventh*, with no scientific support whatsoever, for the first time on appeal

the Director asks this Court to speculate on whether some R group might have an adverse affect on the synthesis of the invention. Brief of Appellee, page 22, lines 4-7. Besides it being improper to consider this new argument at all, in point of fact the original specification taught an opposite effect.

*Twelfth*, while dependent claim 2 is for additional "tandem" metal atom chains "coordinated" with the conducting backbone chains of the primary invention, there are **no metal atoms** in the structure of the independent claims, and are not attached to them. Appx 160. The Director is totally confused in referring to "metal R groups." Brief of Appellee, page 20. Metal atoms can be no such thing, by the definition of R group that the Director itself offers this Court..

## ARGUMENT

### 1. *Amgen v. Sanofi* Is Categorically Distinguished Because There They Had No Common Core Structure At All, While Here The Function Is Based Entirely On Core Structure

*Amgen v. Sanofi* was not a case cited by Pen below. It is not even a case that was argued, let alone by the Examiner. Instead, it was a case that the PTAB dug up on its own **after** the appeal there was submitted to them. Pen's only interest in *Amgen* is in demonstrating just how far off point it actually is.

The central question, as already highlighted in Pen's Opening Brief, is the relationship between **"structural"** variants and **functionality.** Opening Brief at 9.

At this point one might well paste in every paragraph of the entire section A of the opinion of Justice Gorsuch, because there isn't a word in it that doesn't support Pen's argument that *Amgen* is the exact opposite of the situation here. This Court may pick any of them and reproduce them in full for the purpose of its ultimate opinion, though compacted here, with citations removed.[6]

> "**Antibodies are incredibly diverse.** Some scientists estimate that there may be as many unique antibodies as there are stars in the galaxy . . . This diversity shows up in both **structure and function**.
>
> Start with structure . . . Antibodies are made up of amino acids, and scientists commonly identify a particular antibody according to its specific sequence of amino acids . . . the atoms of the amino acids interact with each other, they create folds that result in **complex three-dimensional shapes.** Scientists refer to an antibody's intricate topography as its "tertiary structure."
>
> An antibody's **structure does much to dictate its function—its** ability to bind to an antigen and, in some instances, to block other molecules in the body from doing the same . . . Different antibodies have different binding and blocking capacities based on the amino acids that compose them and their **three-dimensional shapes**.
>
> Despite recent advances, aspects of antibody science remain **unpredictable.** For example, scientists understand that **changing even one amino acid in the sequence can alter an antibody's structure and function** . . .It's going to get a Nobel Prize for somebody at some point, but translating that sequence into a known three-dimensional structure is still not possible." *Amgen* at 599-601 (emphasis supplied).

---

[6] Most of the citations are to a certain "Winter Brief" that the Supreme Court found especially helpful to get the science right.

The Supreme Court ruled against Amgen in their case precisely and only because there was no uniform core structure in their claims that could be relied on to deliver functionality, let alone predicted. The "vast" class of antibodies, the "entire kingdom" for which the Supreme Court would not grant Amgen exclusive licence included literally every possible three-dimensional structure that could ever exist. *Amgen* at 613.

The exact opposite is the case here. As clearly and expansively taught in the original specification, and as already quoted in Pen's Opening Brief at page 11, the conductivity of the invention is entirely a function of the **conjugated chain of alternating single and double bonds** in a ladder polymer, where the core twin functional structures are identical across all claimed variations of the invention. Appx049, lines 6-16.

On actual scrutiny of *Amgen* therefore, the Director got it exactly upside down. The Director argues that Pen's claims are "**like** the antibody claim" in *Amgen* because they are "only limited by a common core structure," Brief of Appellee, pages 10-11. But as we just read, there is no common core structure whatsoever in the *Amgen* claims, which take the form of "complex three-dimensional shapes" that are not even predictable.

**2. The Specification Provides The Starting Material And Reaction Conditions For Enabling The Keystone Member Of The Class, Which Necessarily Enables Other Members Of The Class With The Same Basic Core Structure**

It cannot be disputed that the specification identified the primary monomer starting material of the invention as pyrrole-3,4-diamine. Neither can it be disputed that the multiple literature references[7] and other details in the specification enable the synthesis presented. Even the Director now admits:

> "[T]he Examiner did not find that the '878 application provides no information about **the chemical reagents and reactions that may be used to synthesize the claimed metallole polymers**."[8] Brief of Appellee, page 12.

That gets us to the founding member of the class, named as polycyclopyrrole ("PCPy") by Pen.

But what the Director still fails to grasp is that admission ends the argument and this case. No matter how the Director tries to exaggerate the size of the class, using hyperbolic words like "massive," the Director admits they all share one of two "polycyclic backbones." Brief of Appellee, page 14, lines 13-15.

This is more than sufficient to enable all other members of this so limited class, where the controlling case law only requires a common "general quality," as

---

[7] Also being filed herewith as part of a Supplemental Appendix Addendum.

[8] Despite the misleading name, there is are no metal atoms in a metallole.

even *Amgen* would allow:

> "All this is not to say a specification always must describe with particularity how to make and use every single embodiment within a claimed class. **It may suffice to give an example** (or a few examples) if the specification also discloses **'some general quality ... running through' the class** that gives it 'a peculiar fitness for the particular purpose.' *Incandescent Lamp*, 159 U.S., at 475, 16 S.Ct. 75," *Amgen* at 610-611 (emphasis supplied).

Here we have far more than a "general quality," we have twin functionally identical core structures.

**3. Examiner And The Director Have Now Had Two Opportunities To Dispute Pen's Contentions About What One Skilled In The Art Would Know *A Priori*, And Have Failed To Do So**

As the drafter of the patent, Pen is entitled to presume what "one skilled in the art" would necessarily know on their own. The reaction by which standard pyrroles polymerize is well known. Among many other things Examiner objected to **for the first time in the last, final rejection** was that the specification failed to disclose **"**synthetic route **including mechanism**." Appx183. It has been the position of Pen throughout these appeals that the second and concurrent step in the synthesis, the substitution of adjacent amine groups is also a well known reaction. All this relates to the "predictability in the art" *Wands* factor. Pen made these points in his Appeal Brief to the PTAB. As to the latter:

> "At this point one skilled in the art would know one of the amines in the 3 or 4 position of the starting material would be oxidized to a conjugated imine, a highly reactive functional group that could not help but participate in a substitution reaction with an adjacent and perfectly positioned amine substituent, especially under the catalyzing acidic conditions expressly specified by applicant. This is all absolutely predictable, the starting material, pyrrole-3,4-diamine is expressly given, with an additional synthesis of that taught in the continuation-in-part 16/104,878 specification, paragraph [0030]." Appeal Brief to the PTAB, Appx 156-57.

And also in Pen's Opening Brief here that same language was quoted again. Appellants' Brief. Page 17. If any of this was not good science, Examiner and the Director have had every fair opportunity to dispute these presumptions . . . and have failed to do so.

Accordingly, for the purpose of this appeal these are not only undisputed contentions, they have now been doubly undisputed. Pen says all this is within the certain grasp of "one skilled in the art" and neither the PTAB nor the Director has ever even countered the theory of the synthesis.

**4. The Director's New Argument On Appeal On The "x" Number Of R Groups Is Not Only Untimely, It Is Greatly Exaggerated**

No question about the "x" number of R groups was ever a part of the final rejection in this case or the Examiner's argument before the PTAB. **Moreover, the Director's assertion that the PTAB opinion included this ground is categorically not true**. Brief of Appellee, page 15, line 7. All the Director is

doing here is trying to throw every piece of spaghetti they can think of against the wall, whether it was ever on the Examiner's plate or not.

The Director has itself already provided this Court with the case law on why untimely appeal arguments cannot be heard. *See In re Google Tech. Holdings, LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020); *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1362 (Fed. Cir. 2012).

But even beyond that, the Director raises the specter of "***any*** number of R groups 'x' from zero on up," trying to make it sound like the biggest possible issue. In this case, the "M" atom in the figures has already been restricted to nitrogen,[9] which one skilled in the art would know can only form a maximum of three bonds to other atoms without acquiring a positive charge.[10] So in **Fig. 4** the "x" number would be necessarily be zero, and in **Fig**. **2** the "x" number would be at most one, for most practical purposes. Appx074-075.

### 5. If The PTAB Can Make A *Sua Sponte* Argument After The Case Is Submitted To Them, Surely Pen Can Offer His Rebuttal Here

In multiple places, the Director makes a new argument on appeal, and then

---

[9] When this '878 application was filed options were still included for all other suitable metallole atoms like sulfur and phosphorus, which can form higher order numbers of bonds. But Examiner required Pen to restrict the application to just one, greatly reducing the scope of the class right there. Appx083.

[10] An absolute maximum of 4 total bonds (not R groups) in the latter case.

contends that Pen has **forfeited** his right to counter it, apparently because Pen did not psychically preempt it before the PTAB. Brief Of Appellee, pages 19-20. In this case, the PTAB cited new inapposite cases that were never even considered in the argument, *Amgen* and *Wright,* which we will continue to discuss here. Appx007-008. And the PTAB also made a new factual argument asserting that a polymer of potentially unlimited length was a ground for rejection, which will be further rebutted in section 8, *infra*. Appx008.

Pen has already just demonstrated for purely structural reasons[11] just how inapposite the *Amgen* case is, in section 1, *supra*. But, in his Opening Brief Pen had offered additional rebuttal on purely common sense grounds that any lay person can understand, no “expert testimony” or “learned treatise” required. Brief of Appellee, page 19.

Seriously . . . that there is no electrical conductivity between two points that are not connected, is there even a plausible debate about that?? Any lay person knows that electricity follows the path of least resistance. Without a path there is no conductivity.

The R groups if present are **side groups,** for example the hydrogen atoms in figure on page 15 of the Opening Brief attached to the nitrogen atoms in the

[11] Countering the structural argument in the Brief of Appellee, page 11.

number one position, which the Court can see for itself. And that's all Pen was saying in his Opening Brief here, that the R groups are clearly connected to nothing else, and that the teaching of the specification was that the core conductivity is a property of the polycyclic backbone chains alone, with their alternating double and single conjugated bonds. Opening Brief, pages 11-12.

The Director has argued in its own standard of review section:

> "This Court has defined substantial evidence as that which '"a reasonable mind might accept as adequate to support a conclusion."' *In re Gartside*, 203 F.3d 1305, 1312 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229-30 (1938))." Brief of Appellee, page 13.

Pen simply requests that reasonable minds now do what reasonable minds do.

Just as in *Amgen*, the variations were everything for *Wright*, where the goal was to bind to viruses to inhibit them. The infinitely variable three-dimensional structures of the envelope proteins of fast mutating viruses presented **exactly the same functional dilemma** as in *Amgen,* where their invention wouldn't work at all without a close structural mating. *Wright* at 1560. As a consequence the Court noted:

> "[M]any of the appealed claims encompass vaccines against AIDS viruses and that, because of the high degree of genetic, antigenic variations in such viruses, no one has yet, years after his invention, developed a generally successful AIDS virus vaccine." *In re Wright* at 1562.

So again, in stark, diametric contrast to these other two cases, the common

core conductive structures here are everything for the function for this invention, and any possible R group variations are nothing.

**6. A Working Example Is Not Mandatory To Enable A Patent Application**

The Director puts a great deal of undue emphasis on the question of a "working example." This is just one of the things that the Examiner never asked for in the **six years**[12] this patent prosecution had taken already, through the final rejection of the second successive application ('878). There is a clue to the weakness of this argument, repeated over and over, in the Director's filing. The Director refers to Pen's **Figs. 1** and **2** as a "prophetic" example. Brief of Appellee, page 15, line 1. Prophetic? That's a curious word to use in the context of a patent application. So Pen looked it up, and here is what Pen found, the first case being in a similar scientific formulation field to this case.

> "The courts have sanctioned the use of prophetic examples to meet the written description and enablement requirements for a patent application. *See*, e.g., *Allergan, Inc. v. Sandoz Inc.*, 796 F.3d 1293, 1310 (Fed. Cir. 2015) ("efficacy data are generally not required in a patent application" and "**a patentee is not required to provide actual working examples**"). A patent application does not need to provide a guarantee that a prophetic example actually works. *Id.* at 1310. "Only a sufficient description enabling a person of ordinary skill in the art to carry out an invention is needed." *Id.* The courts have further cautioned that the presence of prophetic examples alone should not be the basis for asserting that a specification is not

[12] Including the virtually identical '829 parent, this being year nine now.

> enabling; rather, a lack of operative embodiments and undue experimentation should be determinative. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1577 (Fed. Cir. 1984)." 86 FR 35074 (emphasis supplied).

Since a working example is not a mandatory requirement, the Director is beating over and over a horse that was never alive in the first place.

**7. With Regards To The *Wands* Factors The Bottom Line Is the Standard Of Undue Experimentation, And That Is Controlled By *Genentech*.**

The PTAB credited the Examiner for presenting "a detailed discussion of the *Wands* factors" despite the fact that he did not actually cite *Wands.* Appx006. So while Pen was not alerted that it was a *Wands* argument specifically he was supposed to be countering, Pen did indeed rebut the individual points presented; for example, Appx194 (state of the art), Appx158 (working example), etc., and in particular on the question of undue experimentation:

> "The test of enablement is not whether any experimentation is necessary, but whether, if experimentation is necessary, it is undue. *In re Angstadt,* 537 F.2d 498, 504, 190 USPQ 214, 219 (CCPA 1976)." Appx 157.

But what is the actual dividing line between due and undue experimentation? That is the critical importance and value of the *Genentech* case, cited for this purpose in Pen's Opening Brief at page 21.

The Director quotes language from the same section of *Genentech* as Pen, but quite deliberately misses the point entirely in the language they highlight.

Brief of Appellee, page 21. It is precisely because **Genentech did not provide starting material or reaction conditions** that they could not salvage their position with a knowledge of one skilled in the art argument. "**Genentech's arguments, focused almost exclusively on the level of skill in the art**." *Genentech* at 1366. There is no such problem with Pen's specification, as we have already established, and as the Director has already admitted, at least as far as the first embodiment of the class. *See* section 2, *supra.*

Pen's knowledge of one skilled in the art argument is quite different, **and is directed to Examiner's complaint that not enough theory was taught.** *See* section 3, *supra*. With teaching of the starting material and reaction conditions in hand,[13] the specification is fully enabling whether one understands the reaction mechanism or not. Thus again, no finding of "undue experimentation" can be made, the only aspect of the *Wands* case that the PTAB opinion even discussed.

**8. From The Very Beginning Of The Parent '829 Application The Claims In This Case Have Been For A Long Chain Polymer**

The only reason why any "more than" some "n" number language ever

---

[13] The Director has now filed a Supplemental Appendix containing the Fukuzawa research paper. So for completeness, Pen will be filing herewith his own Supplemental Appendix Addendum to that, containing the research papers **from the specification** which gave all the standard pyrrole polymerization reagents and conditions, plus the published '829 application, continuing with Bates number SAppx16.

became a part of any of these claims is because in the parent ‘829 prosecution Examiner demanded that Pen distinguish his invention from a reference Examiner had found, He, et. al (US 20100305288), which showed a short oligomer of no more than 8 monomer subunits, with sulfur as the heteroatom. Appx231.

Pen had already taught that such short molecules were useless for bulk conductivity, contrasting his invention with another virtually identical formulation, the Fukuzawa paper. SAppx026, paragraph [0042], lines 7-15.

> “In the case of sulfur there are examples in the scientific literature of short oligomers limited to as many as eight sulfur atoms so arranged, but no attempts at full polymerization. [Chem. Asian J.2009, 4, 1386, 1395, Fig. 6]. Such short constructions will not conduct very far, a critical difference if conductivity is the objective, such that for this purpose polymers have a fundamentally different character from what are called oligomers.” *Id.* from the parent ‘829 application, **and identical** to the current ‘878 application. Appx054, lines 8-12.

Way back then, Pen additionally argued that acting as his own lexicographer in this way obviated the need to overcome a short oligomer example like either He or Fukuzawa*,* and even cited to Examiner the very same scientific definition of which Pen has asked this Court to take judicial notice, which formally defines a proper “polymer” as comprised of 50 sub-units on up. Appx221-222.

But Examiner was insistent that there be further limitation in the claims, and **after addition of the “more than eight" language Examiner agreed that He would be overcome by so doing**. Appx232, lines 1-2. And Examiner further

agreed that the invention was **allowable "in proviso"** if the specification was revised to include the "more than eight" language. Appx230, lines 2-5. So Pen duly proceeded to file the instant '878 application so modified, and strictly for insurance purposes included a more than 50 option, and one other.

There are two critical things to take away from all this: 1) if there is any error in any of these "more than" numbers it is an error **expressly demanded by Examiner**, and 2) all this "more than" language is in fact **entirely superfluous**, because just the words "long chain polymer" in the claims say it all. Appx067.

And the cruel irony is that, even as we are now hung up about more than this or more than that, when the Examiner demanded that the new '878 application be restricted, Appx083, and when Pen complied by electing to proceed with the nitrogen incorporated species only, Appx087, any need to overcome the sulfur compounds of He or Fukuzawa, or to have any of this extra language in there to placate the Examiner, became instantly obsolete. The bottom line is that there should be **no harm** if any "more than" language remains in there, for "long chain polymer" still comports with and supercedes all. And Pen also made sure that the **new '878 application expressly taught that the length of these polymers is potentially unlimited,** as is the case with all polymers regardless as a matter of basic science. Appx055.

In short, for the PTAB to suddenly and *sua sponte* make an issue of this after case submission, with a rejection that the polymer might be too long, is not supported by any objection Examiner ever made, and beyond that is just plain scientifically uninformed. Appx008.

**9. Pen Provided Multiple References In The Specification With Reagents And Conditions For The Synthesis, And Fukuzawa Wasn't One Of Them**

Pen had an information disclosure obligation to search for and identify the closest prior art, however inferior and unsuitable for the purpose of the invention. And Pen honored that obligation by finding Fukazawa. Examiner himself found another reference virtually the same, and no better, which was the He application. And Pen made it abundantly clear the first time he referenced Fukuzawa in the parent '829 application that it in no way enabled his invention. SAppx026, paragraph [0042], lines 7-10.

But Examiner in his final rejection and argument to the PTAB stood the matter entirely on its head, arguing that Pen tendered Fukuzawa as a example of how to perfect the invention, Appx143-144, when quite to the contrary Pen had called it out for being incapable of doing any such thing.[14] SAppx026, Appx054.

---

[14] None of the Fukuzawa products were never proposed as conductors, but instead only as **semiconductors**, a totally different beast. SAppx002-004, SAppx008-009, SAppx011-013.

And the Director has now eagerly adopted this upside down logic and repeats it over and over, though there is no specific evidence in their opinion that the PTAB ever took it seriously. Brief of Appellee, pages 1, 4, 6, 10, 15 and 16.

What we are talking about here is the "state of the prior art" factor in *Wands*, which the Director would have this Court construe as a requirement to show that someone else had already achieved Pen's invention exactly, before Pen invented it. Instead, the "state of the prior art" in this case are the known chemical reactions which comprise the synthesis. It was to this end that Pen provided references to no less that 5 different research papers that collectively provide all the reagents, solvents, temperature, etc., that a lab tech could hope for. For example, SAppx032, SApp034-035, SAppx041, SAppx045, SAppx051, etc.

Above all we must presume that one skilled in the art, armed with such research papers, can figure out how to perform these syntheses. And add to that Pen's additional disclosure to use a pyrrole starting monomer with amines as substituents in the 3 and 4 positions, and to catalytically acidify the reaction mixture in the range of about 2 to 5 pH, and the theory of the synthesis is complete. Appx050. Throughout 2 stages of appeal now, neither Examiner nor the Director has ever disputed this basic known chemistry. *See* section 3, *supra*.

**10. The Director's Wild Chemistry Speculations Can't Even Be Considered**

The Director now posits no less than three, more than dubious, chemistry theories for the first time for the purposes of this appeal, to try to drum up as much confusion and doubt as possible; 1) that some R side group might "adversely affect" the electroconductivity of the backbone chain, or 2) that some R group might have an adverse affect on the synthesis of the invention, or 3) that a metal atom could even be an R group. Brief of Appellee, pages 10, 22 and 20.

In the first instance, they are precluded by their own new argument on appeal objection, and their own attorney argument objection:

> Such unsupported statements are entitled little weight. *See Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017) ("Attorney argument is not evidence")(citation omitted); *see also* MPEP § 2145 ("Attorney argument is not evidence unless it is an admission, in which case, an examiner may use the admission in making a rejection."). Brief of Appellee, page 16.

But in addition, each is more absurd than the previous.

As to the first, The R groups are side groups that are not in the connected chains of atoms that create the conductivity. As to the second, in the starting material the amines groups are themselves R groups at that stage, connected to the carbon atoms in positions 3 and 4. And to the contrary, the specification taught they **enhance the regioselectivity** of the synthesis and explained the more arcane subtleties of the reason for this. Appx050, lines 10-21. And as to third,

> An "R group" is "[a]n abbreviation for any group in which a carbon or hydrogen atom is attached to the rest of [a] molecule. Sometimes used more loosely, to include other elements such as halogens, oxygen, or nitrogen." Brief of Appellee, page 5, footnote 3.

A metal atom can be no such thing by the Director's own footnote proposed definition of an R group[15] And there are no metal atoms "attached" to the backbone chains even in the dependent claims. Appx 051.

## CONCLUSION

Based on all the foregoing, Pen again respectfully submits that the PTAB decision mailed 6/7/2023 should be reversed as to the second ground for rejection.

Dated: March 18, 2024

/s/ The Pen

The Pen
Appellant Pro Se
954 Palm Ave., #103
West Hollywood, CA 90069
Tel: (310) 360-0640
dc@thepen.us

[15] And by the way, somehow it's OK for the Director to tender an online definition, but they would forbid this Court from granting Pen's judicial notice request for the definition of a "polymer." Brief of Appellee, pages 15-16.

CERTIFICATE OF SERVICE

I certify that I served a copy of this Reply Brief of Appellant on counsel of record on March 18, 2024 by electronic means (CM/ECF), together with a supplemental appendix addendum, extending the Bates numbers of the supplemental appendix filed by opposing counsel with their Brief of Appellee.

Dated: March 18, 2024

/s/ The Pen
The Pen
Appellant Pro Se
954 Palm Ave., #103
West Hollywood, CA 90069
Tel: (310) 360-0640
dc@thepen.us

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the applicable type-volume limitations because it contains 5,972 words, from the Summary of the Reply through to the end of the Conclusion. This certificate was prepared in reliance on the word-count function of the word-processing system (Corel WordPerfect 8.0) used to prepare this brief.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Corel WordPerfect 8.0 in 14-point Times New Roman font.

Dated: March 18, 2024

/s/ The Pen
The Pen
Appellant Pro Se